SHERIFF OF WASHOE COUNTY, NEVADA, APPELLANT, *v.* JESSE AVERY MARTIN, RESPONDENT.

No. 14604

April 29, 1983                              662 P.2d 634

*Brian McKay,* Attorney General, Carson City; *Mills Lane,* District Attorney, Washoe County, for Appellant.

*Polaha & Conner,* Reno, for Respondent.

## OPINION

By the Court, MOWBRAY, J.:

Respondent was arrested and charged with two counts each of card cheating in violation of NRS 465.083 and conspiracy to commit card cheating in violation of NRS 199.480 and NRS 465.083. After being bound over to the district court for trial,

respondent petitioned the district court for a writ of habeas corpus. Among other contentions, he argued that the definition of cheating in NRS 465.015, on which the charges against him rested, was unconstitutionally vague. The district court agreed, and dismissed the charges. We hold that the statutory definition of cheating is not unconstitutionally vague, and therefore reverse and remand for trial.

## THE FACTS

The following facts were adduced at respondent Martin's preliminary hearing. On April 10, 1982, Martin was playing "21" at Boomtown, in Verdi, Nevada. He was seated to the left of a known card crimper, Dennis Wayne Petersen. Card crimping is the act of deforming a card, often by bending the corners, to make the point value of the card readable to the crimper from the back as well as the face of the card.

Casino employees and Gaming Control Board agents placed the table under observation. The deck in play was exchanged for a new deck, and the used deck was found to contain many crimped cards. Petersen was observed crimping several cards in the new deck.

Martin consistently asked Petersen how he should play his cards. Before the deck was changed, Petersen watched the deck closely as the cards were being dealt, frequently standing up to do so. He was playing a single hand and betting $5-$10 per hand, while Martin was betting about $100 per hand. Petersen also hit his hand in an unusual pattern. Immediately after the deck was changed, Petersen ceased watching the deck and began to play two hands, while Martin's bets dropped to about $25 per hand. After a period of ten to fifteen minutes, during which Petersen was observed crimping cards in the new deck, Petersen went back to playing a single hand, and Martin's bets went back up to about $100 per hand. A Gaming Control agent also noted a correlation between Petersen's touching of a particilar stack of chips and Martin's taking a hit. A card expert employed by the casino testified that Martin's and Petersen's behavior indicated that they were working together. Martin was ahead several hundred dollars at the time he and Petersen were removed from the table and detained by casino security personnel.

Martin and Petersen were arrested and charged with two counts each of card cheating in violation of NRS 465.083 and conspiracy to commit card cheating in violation of NRS 199.480 and NRS 465.083 (one count for each deck of cards). Petersen jumped bail, and the State proceeded against Martin alone. After his preliminary hearing Martin was bound over to

the district court for trial. Martin subsequently petitioned the district court for a writ of habeas corpus, challenging the legality of his restraint on several grounds. After a hearing on the petition, the district court entered an "Order of Discharge" under NRS 34.500(8), dismissing the charges against Martin on the ground that the definition of cheating in NRS 465.015, on which NRS 465.083 rests, is unconstitutionally vague. This appeal followed.

## NRS 465.015 IS NOT UNCONSTITUTIONALLY VAGUE

NRS 465.083, as amended in 1981, provides that "[i]t is unlawful for any person, whether he is an owner or employee of or a player in an establishment, to cheat at any gambling game." NRS 465.015, added in 1981, provides that " '[c]heat' means to alter the selection of criteria which determine: (a) The result of a game; or (b) The amount or frequency of payment in a game." The district court held that the phrase "to alter the selection of criteria" made the penal statute unconstitutionally vague.

It is well settled that the Due Process Clause of the Fourteenth Amendment prohibits the states from holding an individual "criminally responsible for conduct which he could not reasonably understand to be proscribed." United States v. Harriss, 347 U.S. 612, 617-18 (1954). See Rose v. Locke, 423 U.S. 48, 49 (1975). Laws must give a person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly, and must also provide explicit standards for those who apply the laws, to avoid arbitrary and discriminatory enforcement. Hoffman Estates v. Flipside, Hoffman Estates, 455 U.S. 489, 498 (1982). See Smith v. Goguen, 415 U.S. 566, 572-74 (1974); Papachristou v. City of Jacksonville, 405 U.S. 156, 162 (1972).

A statute therefore violates the due process requirement of specificity if it "either forbids or requires the doing of any act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application. . . ." State, Nev. Gaming Comm'n v. Glusman, 98 Nev. 412, 651 P.2d 639, 644 (1982), quoting Connally v. General Construction Co., 269 U.S. 385, 391 (1926). However, "[t]he Constitution does not require impossible standards of specificity in penal statutes. The test of granting sufficient warning as to proscribed conduct will be met if there are well settled and ordinarily understood meanings for the words employed when viewed

in the context of the entire statutory provision.'' Woofter v. O'Donnell, 91 Nev. 756, 762, 542 P.2d 1396, 1400 (1975). *See* Wilmeth v. State, 96 Nev. 403, 405, 610 P.2d 735, 737 (1980). As the High Court noted in Rose v. Locke, *supra,* the prohibition against excessive vagueness

> does not invalidate every statute which a reviewing court believes could have been drafted with greater precision.
>
> Even trained lawyers may find it necessary to consult legal dictionaries, treatises, and judicial opinions before they may say with any certainty what some statutes may compel or forbid. . . . All the Due Process Clause requires is that the law give sufficient warning that men may conduct themselves so as to avoid that which is forbidden.

*Id*. at 49-50. Moreover, if an enactment does not implicate constitutionally protected conduct, the court may strike it down as vague on its face only if it is impermissibly vague in all of its applications. *Hoffman Estates,* 455 U.S. at 494-95; *Glusman,* 98 Nev. 412, 651 P.2d at 645. A challenger who has engaged in conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others. 455 U.S. at 495. *See* United States v. Harriss, 347 U.S. at 617-18. *See also* Bludsworth v. State, 98 Nev. 289, 646 P.2d 558 (1982).

Acts of the Legislature are presumed to be constitutional, and the party challenging an enactment bears the burden of making a ''clear showing'' of invalidity. Ottenheimer v. Real Estate Division, 97 Nev. 314, 629 P.2d 1203 (1981); County of Clark v. City of Las Vegas, 97 Nev. 260, 628 P.2d 1120 (1981); Wilmeth v. State, *supra.* Where the intention of the Legislature is clear, it is the duty of the court to give effect to such intention and to construe the language of the statute to effectuate rather than nullify its manifest purpose. Woofter v. O'Donnell, *supra. See* Cummings v. City of Las Vegas Mun. Corp., 88 Nev. 479, 499 P.2d 650 (1972).

Applying these rules, we find that the definition of cheating in NRS 465.015 is not unconstitutionally vague on its face or as applied to respondent. The Legislature sought by this generic definition to prohibit all forms of cheating, and thus to avoid the many gaps and loopholes left by the prior cheating statutes. *See* NRS 465.070-465.083 (1979). While we have never before construed the phrase ''to alter the selection of criteria which determine [the outcome of the game],'' the words bear an easily ascertainable meaning. Webster's Third New International

Dictionary (1976) defines "criterion" as either a characterizing mark or trait, or a standard on which a decision or judgment may be based. The same dictionary defines "selection" as either the act or process of selecting, or that which is selected (choice). In light of the statutory purpose, we interpret the current cheating statutes to proscribe the alteration of the group of characteristics which identify and define the game in question. The attributes of the game—its established physical characteristics and basic rules—determine the probabilities of the game's various possible outcomes. Changing those attributes to affect those probabilities is a criminal act.

In addition, the statutes and the legislative history do not suggest that the Legislature intended to remove from the crime of cheating the requirement of fraudulent intent. *See* NRS 199.480(2)(d). We have consistently drawn parallels between cheating and fraudulent conduct. *See, e.g.,* Isbell v. State, 97 Nev. 222, 226, 626 P.2d 1274, 1276 (1981); Laney v. State, 86 Nev. 173, 177, 466 P.2d 666, 669 (1970). *See also* Tax Comm'n v. Mackie, 75 Nev. 6, 11, 333 P.2d 985, 987 (1959) (dicta) (lack of evidence of respondents' knowledge of their employees' operation of cheating games "might well serve to protect respondents against any criminal charge of cheating"); Wallace v. Opinham, 165 P.2d 709,710 (Cal.App. 1946). *Cf.* Berman v. Riverside Casino Corp., 247 F.Supp. 243, 251 (D. Nev. 1964), *aff'd,* 354 F.2d 43 (9th Cir. 1965)(knowledge and control are minimum requirements for imposing civil or criminal liability under statute prohibiting act of allowing operation of any cheating or thieving game or device). Thus, if a player or dealer deceitfully alters the identifying characteristics or attributes of a game with the intent to deprive another of money or property by affecting the otherwise established probabilities of the game's various outcomes, he or she is guilty of cheating within the meaning of NRS 465.015 and NRS 465.083.

By crimping cards, respondent's alleged co-conspirator in effect made the cards readable on both sides. While this did not alter the location of the cards in the deck, which was established randomly by the dealer's shuffling, it did alter a crucial characteristic of the game. The card crimper by his actions eliminated the element of chance as to himself and respondent concerning the point value of the top cards in the deck at the time of deciding whether or not to take a hit. The other players' knowledge of those cards was based solely on their observation of the cards already played and the laws of probability. "What

a man does not know and cannot find out is chance as to him, and is recognized as chance by the law.'' Dillingham v. McLaughlin, 264 U.S. 370, 373 (1924). *See* State v. Koo, 647 P.2d 889, 892 (Okla.Crim.App.), *cert. denied,* 103 S.Ct. 447 (1982)(any result over which a party does not have control can be considered to be chance).

By way of contrast, a card counter—one who uses a point system to keep track of the cards that have been played—does not alter any of the basic features of the game. He merely uses his mental skills to take advantage of the same information that is available to all players.

The evidence adduced at Martin's preliminary hearing was sufficient on the elements of conduct and intent to warrant binding him over for trial, and indicates that he was or should have been on notice that his conduct was proscribed by NRS 465.083 and NRS 199.480. We therefore reverse the order of the district court dismissing the charges against Martin, and remand the matter to the district court for trial.

MANOUKIAN, C. J., and SPRINGER, STEFFEN, and GUNDERSON, JJ., concur.