TROY DON BROWN, Appellant, v. THE STATE OF NEVADA, Respondent.

No. 27426

February 26, 1997             934 P.2d 235

*Dennis E. Widdis,* Reno, for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Gary D. Woodbury,* District Attorney, and *John S. McGimsey* and *Robert J. Lowe,* Deputy District Attorneys, Elko County, for Respondent.

---

[8]The Honorable A. William Maupin, Justice, did not participate in the decision of this matter.

# OPINION

*Per Curiam:*

Appellant Troy Brown was tried and convicted of sexually assaulting Jane Doe, a nine-year-old girl.[1] Troy was convicted of two counts of sexual assault of a child under fourteen years of age, and one count of child abuse by sexual abuse. He was acquitted of one count of attempted murder. Troy claims on appeal that (1) he was improperly denied bail; (2) the DNA evidence was improperly admitted because no evidentiary hearing was held; (3) sufficient evidence did not exist to support his conviction; (4) double jeopardy barred his convictions for both sexual assault and child abuse by sexual abuse; and (5) the district judge abused his discretion during the sentencing phase of the trial.

We conclude that the district judge properly denied bail for Troy, that the DNA evidence was properly admitted at trial, and that sufficient evidence existed to support Troy's conviction. However, we conclude that Troy's conviction for both sexual assault and child abuse by sexual abuse violated the double jeopardy provision of the Constitution and that the conviction for child abuse must be vacated. Finally, we conclude that the district judge abused his discretion during the sentencing phase of the trial and the case must be remanded to the district court for a new sentencing hearing on the remaining sexual assault conviction.

## FACTS

In the early morning hours of January 29, 1994, Jane Doe was sexually assaulted in the bedroom of her trailer home at 1637 Pruett Street in Carlin. Jane Doe and her four-year-old sister were home alone while their mother, Pam, was drinking at a bar, and their step-father, Wayne, was working the night shift at his job. Troy was arrested, tried, and convicted for the crime.

On January 28, 1994, before Wayne went to work, Pam received a telephone call from Raquel Brown. Raquel was married to Trent Brown, Troy's brother. Raquel wanted to know if Pam would like to join Raquel and Trent at a local bar named "CG's" for a drink and also to know if Jane Doe could babysit her children for the approximately one-half hour they expected to stay at the bar. Pam agreed that Jane Doe could babysit the children for that short amount of time and at approximately 6:30 p.m. Pam took Jane Doe and her sister over to Raquel's house

---

[1]The victim's real name has been changed to protect her identity.

located across the street at 1709 Pruett Street. Pam and Raquel then went to CG's to meet Trent.

Raquel and Trent stayed at CG's for a very short time and returned home at approximately 7:30 p.m. Pam, however, remained at the bar. When Raquel and Trent returned home, all of the children were watching a movie; when the movie ended at approximately 9:30 p.m., Raquel took Jane Doe and her sister back to their trailer. When Jane Doe got back to the trailer, she attempted to call her mother at CG's to tell her that she and her sister were home, but the telephone line at CG's was busy. Jane Doe then called the Peacock Bar to see if Pam was there; Troy, who was drinking at the Peacock Bar, answered the phone. Jane Doe asked Troy if Pam was there, and Troy stated that he thought that she was at CG's. Jane Doe said that she was trying to find Pam in order to tell her that she and her sister were home safely, and Troy said that he would go to CG's to deliver Jane Doe's message. Troy then went to CG's, but when he arrived, Pam was already talking to Jane Doe on the telephone. Jane Doe had already informed Pam that she and her sister were home safely.

Pam stated that after she finished talking to Jane Doe, she and Troy went to the Peacock Bar where they had a drink and played a game of pool. Pam stated that Troy was drunk but that he behaved like a gentleman and made no sexual advances toward her. Pam stated that the last time she saw Troy was sometime between 11:00 p.m. and midnight. Pam stated that at approximately midnight or 12:30 a.m. she received a call at the Peacock Bar from Jane Doe[2] who told Pam that some man was at the trailer looking for Pam and that the man had hurt her. Pam immediately left the bar and drove home, which was a short distance away, where she found Jane Doe covered in blood from the waist down.

Pam called 911, and police officer Michael Terry and the paramedics responded to the scene at approximately 1:15 a.m. Michael Skinner, an emergency medical technician, assessed Jane Doe's injuries, and Jane Doe told Skinner that she felt pain in her vaginal area. While the police and the paramedics were present, Pam stated that her ex-husband had done this because he had threatened to "f...... [Pam's] daughter in order to get back at [Pam]." Trial testimony indicated that the police attempted to locate Pam's ex-husband, but the results of their efforts were not admissible at trial because of the hearsay rules.[3]

---

[2] The bartender on duty stated that the call actually came just before 1:00 a.m.

[3] The implication from the permitted testimony was that the police had determined that the ex-husband had a credible alibi and was not involved in the assault.

Jane Doe was taken to the hospital where it was confirmed that she had been penetrated both vaginally and anally. Jane Doe had lost about fifteen percent of her blood and required a vaginal reconstruction. She also had bruises on her neck and had scratches on her face. A "sexual assault kit" was taken at the hospital, which included a vaginal smear (because sperm was present) and a blood sample. Debris was also collected from Jane Doe's teeth because she stated that she had bitten her assailant.

Jane Doe described to Connie Walker, a police officer specialized in questioning child victims, what had happened in the trailer. The interview took place in the early morning hours of January 29, 1994, shortly after the sexual assault had occurred, and a second interview took place on February 1, 1994. Jane Doe stated that she fell asleep with a night light on, but that the man who assaulted her must have turned it off because it was off when the man left. Jane Doe said that the man touched her "butt" and then put his "thingy" into her vagina. She also stated that the man placed his fingers into "the front and back" of her. Jane Doe described the assailant as follows: he did not wear a hat and had blonde or sandy-colored hair which was curly at the bottom and thinning on top; she thought he had a small moustache; he was wearing dark jeans, a black jacket with "a zipper for sure," a western type shirt, boots, and a watch which scraped her face. At the trial, Jane Doe had difficulty remembering the details of what had happened and stated that what she had told Walker at the interviews was probably correct.

When pressed by police to tell who the assailant reminded her of, Jane Doe stated "Troy," and when the police said, "Who?," Jane Doe said, "Trent. Yes, Trent." Jane Doe stated that Trent was Raquel's husband, Trent Brown. Jane Doe also stated that the assailant's hair looked like Troy's but then changed her mind and said that the hair looked like Trent's hair. Finally, Jane Doe stated that the assailant smelled like cologne but that it was an "awful smell," and that it was "gross smelling . . . [like] beer or puke or something." Jane Doe was shortly thereafter admitted to a hospital where she stayed for twelve days and was diagnosed with post-traumatic stress disorder.

By the late hours of January 28, 1994, Troy was very intoxicated. He testified that he had been drinking steadily at several different bars and had consumed ten shots of hard liquor, each followed by a beer chaser—a total of twenty drinks. Testimony indicated that on the night in question, Troy was wearing dark jeans, a cowboy hat, a black satin jacket with a CG's logo on the back, and boots. Troy stated that he did not wear a watch and therefore did not know what time he had left the Peacock Bar. The bartender on duty stated that Troy left the bar no later than

12:20 a.m. However, another bartender, whose shift had ended but who was still at the Peacock Bar, stated that she believed that she had seen Troy at the bar at approximately 1:30 a.m.

Troy stated that he had left the bar and walked to his trailer on 1717 Pruett Street, approximately ten trailers away from Jane Doe's. Troy stated that because he was so intoxicated, he vomited several times on his way home and some of the vomit got on his pants and shirt. He also stated that because he was going on a one week trip to Utah later in the day on January 29, 1994, he needed all of his clothes which, other than the ones he was wearing, were packed. He washed the pants and shirt he was wearing when he got home because he had vomited on them. Travis Brown, Troy's younger brother, testified that he was sleeping on the couch at Troy's trailer and woke up when Troy got home. Travis stated that he then looked at his digital clock, and it read 1:32 a.m. Travis stated that he saw no traces of blood anywhere in the house.

At 5:00 a.m. on January 29, 1994, Officer Terry went to Troy's home to question him about the sexual assault. Terry awoke and questioned Troy, who was wearing only boxer shorts. Officer Terry stated that he saw no blood on Troy. He also stated that he checked Troy's hands because Jane Doe had told him that she had bitten her assailant's hand, but he found no evidence of any bite marks. Terry also stated that he looked at Troy's boots and saw no blood. After Troy left to go to Utah, the police went back with a search warrant and took Troy's bedding. Troy called the Carlin police to see if he was wanted for arrest, and he was told that he was not. While in Utah, Troy went to a nurse to get a full body examination because Jane Doe had stated that she had bitten and scratched her assailant, and Troy wanted a record of his condition.

Dave Prescott, another of Troy's friends living in Troy's trailer, testified that he had asked Troy on January 29, 1994, whether Troy was involved with the crime and that Troy had answered that he wished that he could remember what had happened. Troy testified that he had told Prescott that he wished that he could remember what time he got home.

Because rumors persisted about Troy's involvement in Jane Doe's assault, Troy voluntarily went in for questioning at the Carlin Police Department on February 3, 1994. Troy gave the police the black satin coat and black cowboy hat that he was wearing on the night of the crime. Troy repeatedly denied involvement in the crime, even though the interrogating officers implied that they had found Troy's fingerprints in Jane Doe's bedroom. In actuality, Troy's fingerprints were not found anywhere in Jane Doe's trailer, and the one fingerprint that was

located on the night light in Jane Doe's room did not match Troy's.

While in a foster home several days after the assault, Jane Doe saw a television report of Troy's arrest and stated that she knew that the man on television was her assailant. Walker and police officer Roy Ladd went to the foster home; Jane Doe told Walker that the man on television had attacked her and had also sent her flowers. However, the card attached to the flowers was signed by Trent and Raquel, not Troy. Additionally, Ladd showed Jane Doe a photo lineup which included Troy's picture and several other people Jane Doe did not know; Jane Doe was unable to identify her assailant from the pictures Ladd showed her.

At trial, the defense called Madonna and Jay Doke as witnesses. They testified that at 1:05 a.m. on January 29, 1994, they were picking up their children from the babysitter's house on Pruett street near Jane Doe's trailer. Madonna stated that as they neared the babysitter's house, she saw a man wearing a black cowboy hat, a black satin jacket, and dark jeans staggering down the middle of the road. She also stated that the man's jacket had a fluorescent green emblem on the back that looked like a skull or bandit. Jay testified that the man wore the same clothes that Madonna had described and also stated that the emblem on the back of the man's jacket was bright green. Testimony indicated that Troy's CG's jacket had an orange and yellow emblem on the back.

Troy voluntarily surrendered to the police and was arrested on or about February 7, 1994. On February 28, 1994, Troy stipulated to his commitment to the Lakes Crossing facility for a psychiatric evaluation. After approximately two months, Troy was found competent to stand trial and was returned for trial. Bail had not been set prior to Troy being sent to Lakes Crossing, and after he returned from Lakes Crossing, bail was set at $200,000. Troy's bail was later reduced to $100,000. Troy was charged with one count of sexual assault on a child under the age of fourteen resulting in substantial bodily harm by placing his penis into Jane Doe's vagina (Count I), one count of sexual assault on a child under the age of fourteen by placing his penis into Jane Doe's rectum (Count II), one count of attempted murder for trying to strangle or choke Jane Doe (Count III), and one count of abuse or neglect of a child less than eighteen years old resulting in substantial bodily harm by forcibly penetrating Jane Doe's vagina and/or rectum (Count IV). Troy's trial commenced on September 27, 1994.

Marie Fassett, a criminalist in the Washoe County Sheriff's Office, examined evidence collected by the police for the presence of bodily fluids, including blood and semen, and stated that

she found semen on Jane Doe's underwear and in the contents of the sexual assault kit. She also examined Troy's boots and found no blood on the boots. However, Fassett stated that she did not examine pubic hairs found in a fleece jacket recovered from Jane Doe's room because her laboratory conducted hair exams only if there was an absence of biological evidence, which she said was not the situation in this case. She also stated that she did not examine Troy's bedding for the presence of hair, fiber, or bodily fluids because she was informed that Troy never went to bed the night of the assault; however, Terry stated that Troy was still in bed when he woke Troy at 5:00 a.m. on January 29, 1994. Fassett stated that she did not examine the bedding and other evidence because the DNA evidence against Troy was overwhelming.

At trial, Renee Romero testified that she had conducted a DNA test on stains found on Jane Doe's underwear. Romero explained in detail what DNA is and how it is tested. Romero testified that the DNA sample tested from Jane Doe's underwear matched Troy's and that only 1 in 3,000,000 people had the same DNA code as the one tested. Troy's counsel cross-examined Romero regarding how she conducted the tests, the amount of DNA required to run the tests, and the databases against which the DNA tests were compared to determine the statistical probability that others would have the same DNA code. However, Troy's counsel did not call his own expert DNA witness even though the court provided funds for such a witness.

At the conclusion of trial, Troy was found guilty of Counts I, II, and IV and was acquitted of Count III, the attempted murder charge. The jury sentenced Troy to life in prison with the possibility of parole (after serving ten years) for Count I. The district judge imposed sentences for Counts II and IV.[4]

At the sentencing hearing, the district judge stated that he was going to make a record of the events so that everyone would know exactly what transpired during the proceeding. While making the record, the district judge specifically stated that he was going to consider Troy's psychiatric reports from Lakes Crossing. The district judge stated that he was reviewing the reports because

---

[4]In 1994, NRS 200.366(3) stated:

> The trier of fact in a trial for sexual assault shall determine whether substantial bodily harm has been inflicted on the victim in connection with or as part of the sexual assault, and if so, the sentence to be imposed upon the perpetrator.

Because the jury determined that Brown was guilty of Count I—sexual abuse resulting in substantial bodily harm—it was authorized to impose a sentence for that count. However, the district judge retained the authority to sentence Brown for Counts II and IV.

Troy and his family felt that Troy was wrongfully convicted and that they were the victims in the case. The district judge then mentioned certain portions of the report which highlighted the dysfunctionality of Troy and his family.

Before sentencing Troy on Counts II and IV, the district judge informed Troy that it was going to make a "big difference" in the length of the sentence whether Troy was finally going to admit his guilt or if he was going to maintain his innocence. Furthermore, the district judge considered additional DNA testing performed after Troy was found guilty; apparently, Troy's family was not convinced of Troy's guilt and had more DNA tests performed with the district judge's permission. The results of the second DNA test showed that the semen taken from Jane Doe's vaginal swab matched Troy's and that only 1 in 10,000 people had similar DNA. The district judge stated that the additional results confirmed what he already knew from the trial—that Troy was guilty. After Troy again maintained his innocence, the district judge sentenced Troy to the maximum penalty, which was life in prison with the possibility of parole after ten years for Count II and twenty years in prison for Count IV. All of Troy's sentences were imposed consecutively.

Troy now appeals his conviction and sentence.

## DISCUSSION

*The district court's denial of Troy's bail did not warrant reversal of the convictions*

Troy was held without bail from February 7, 1994, until May 2, 1994, because the justice of the peace, following the district attorney's recommendation, refused to set bail. The State has acknowledged that the justice of the peace erred by not setting bail immediately.

In State v. Teeter, 65 Nev. 584, 200 P.2d 657 (1948), this court addressed the issue of erroneously holding a defendant without bail. In *Teeter*, the defendant was held without bail for the entire proceedings, and this court concluded that the denial of bail substantially affected the validity of the judgment because:

> 1. It operated to curtail and restrict, as counsel for defendant has urged, the opportunity of defendant to prepare properly for trial.
> 2. A defendant, if he appears for trial as a prisoner in the custody of officers, is in a less favorable position than a defendant on bail. He is not only handicapped by embarrassment and humiliation, but there is some probability, at least, that that sort of appearance may make an unfavorable

impression upon the jurors, to which risk one clearly entitled to bail, as was defendant here, should not be required to be subjected, until his guilt has been proved.

3. There is also the probability that denial of bail, published in the newspapers as was done in the instant case, may make upon the public mind generally an impression that the state's case against defendant is strong, or bail would have been allowed—that is, that the proof must be evident and the presumption great of his guilt—and that such impression may infiltrate into the mental consciousness of jurors.

*Id.* at 609, 200 P.2d at 670.

Applying the *Teeter* factors, we conclude that Troy's being held without bail did not substantially affect the judgment such that reversal of the convictions is warranted. First, from February 28 to May 2, which comprised most of the time that Troy was held without bail, Troy was confined to Lakes Crossing for a psychiatric evaluation. Therefore, if bail had been granted, Troy still would have had to stay in Lakes Crossing; Troy even admits that during his time at Lakes Crossing he was not prejudiced by his lack of bail setting. Furthermore, Troy did not allege any substantial interference with the preparation of his defense while he was being held without bail, other than the fact that his attorney did not engage in trial preparation during Troy's stay at Lakes Crossing. However, this lack of preparation cannot be attributed to Troy's being held without bail. Second, Troy was granted bail before the trial began and therefore did not appear before the jury while in custody. Finally, Troy presented no evidence that his being held without bail was published in the media such that it may have infiltrated into the consciousness of the jurors.

Therefore, we conclude that the district judge's denial of bail did not substantially affect the judgment such that reversal of the convictions is warranted.

*The district court did not err in admitting DNA evidence*

Troy argues that the district judge erred in not conducting a pretrial hearing to determine whether the DNA results were trustworthy and reliable. However, Troy made no objection to either the lack of a pretrial evidentiary hearing or to qualifying Romero as an expert witness on DNA evidence. Failure to object in the district court precludes consideration of the issues on appeal; however, this court may address plain error *sua sponte*. Sterling v. State, 108 Nev. 391, 394, 834 P.2d 400, 402 (1992). Because we conclude that the failure to conduct an evidentiary hearing was not plain error, we will not consider this issue.

*Sufficient evidence existed to convict Troy*

The standard of review for sufficiency of the evidence upon appeal is whether the jury, acting reasonably, could have been convinced of the defendant's guilt beyond a reasonable doubt. Kazalyn v. State, 108 Nev. 67, 71, 825 P.2d 578, 581 (1992). We conclude that a jury, acting reasonably, could have been convinced of Troy's guilt beyond a reasonable doubt.

Testimony indicated that Troy left the bar around 12:15 a.m., that Troy lived relatively close to the bar, and that Troy lived very close to Jane Doe. Troy had enough time to get from the bar to Jane Doe's house and to assault Jane Doe before she made the telephone call to her mother at approximately 1:00 a.m. While Jane Doe could not identify her assailant, her description of his clothing was similar to what Troy was wearing; she also said that her assailant smelled like beer or vomit and testimony indicated that Troy had been drinking beer and had vomited several times that night. Furthermore, testimony indicated that Troy got home at approximately 1:30 a.m., which gave him enough time to assault Jane Doe. Additionally, the Dokes testified that they saw someone resembling Troy in a black jacket and black hat stumbling in the road near Jane Doe's house at 1:05 a.m. Troy also washed his pants and shirt when he got home, arguably to remove the blood evidence from his clothes. Finally, the DNA evidence indicated that semen collected from Jane Doe's underwear matched Troy's and that only 1 in 3,000,000 other people had matching DNA (the second DNA test indicated that 1 in 10,000 people had matching DNA).

*The district court erred in separately sentencing Troy for sexual assault of a child and child abuse by sexual abuse because such sentences violate the constitution's double jeopardy clause*

Troy was convicted of Counts I and II, which were for sexual assault on a child under fourteen years of age, pursuant to NRS 200.366. According to NRS 200.366, sexual assault on a child under fourteen years of age is defined as follows:

> A person who subjects another person [under the age of fourteen] to sexual penetration . . . against the victim's will or under conditions in which the perpetrator knows or should know that the victim is mentally or physically incapable of resisting or understanding the nature of his conduct, is guilty of sexual assault.

NRS 200.366(1). Separate penalty enhancements exist dependent upon whether the sexual assault causes substantial bodily harm or not. NRS 200.366(2)(a) and (b).

Child abuse is defined as follows in NRS 200.508:

> 1. A person who:
> (a) Willfully causes a child who is less than 18 years of age to suffer unjustifiable physical pain or mental suffering as a result of abuse or neglect . . .
> is guilty of a gross misdemeanor unless a more severe penalty is prescribed by law for an act or omission which brings about the abuse, neglect or danger.
> . . . .
> 3. As used in this section:
> (a) "Abuse or neglect" means physical or mental injury of a non-accidental nature, sexual abuse, sexual exploitation
> . . . .

NRS 432B.100 states that "sexual abuse" includes acts upon a child constituting:

> 1. Incest under NRS 201.180;
> 2. Lewdness with a child under NRS 201.230;
> 3. Annoyance or molestation of a child under NRS 207.260;
> 4. Sado-masochistic abuse under NRS 201.262;
> 5. *Sexual assault under NRS 200.366*;
> 6. Statutory sexual seduction under NRS 200.368; and
> 7. Open or gross lewdness under NRS 201.210.

(Emphasis added.)

The prosecution's charging document claimed that Troy had committed child abuse in that he had caused Jane Doe to suffer mental and physical pain by virtue of his sexual abuse, to wit: he forcibly penetrated Jane Doe's vagina and/or anus. Therefore, the prosecution actually charged Troy with child abuse pursuant to NRS 200.508 by virtue of his sexual assault as defined by NRS 200.366. Given the definition of "sexual abuse" in NRS 432B.100, this is the only reasonable interpretation of what the prosecutor claimed constituted the "sexual abuse."

To determine whether Troy's convictions for sexual assault and child abuse by sexual abuse/sexual assault are barred by the double jeopardy provisions of the state and federal constitutions, this court must apply the test from Blockburger v. United States, 284 U.S. 299, 304 (1932), which states: "[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not."[5]

---

[5]We have earlier stated that we must also consider the statute's legislative history to see if the legislature intended for the defendant to receive separate

Applying the *Blockburger* test, we conclude that Troy's conviction for both sexual assault and child abuse by sexual abuse/sexual assault was improper. As charged in this case, child abuse by sexual abuse requires a sexual assault pursuant to NRS 200.366, plus resultant physical pain or mental suffering; sexual assault requires only those elements present in NRS 200.366. Therefore, a conviction for sexual assault does not require proof of a fact other than or additional to any facts necessary to prove child abuse by sexual abuse/sexual assault. In every case such as this one, the child abuse by sexual abuse/sexual assault cannot occur without the sexual assault, and therefore, the sexual assault becomes an element of child abuse by sexual assault. Given this analysis, *Blockburger* mandates that Troy cannot be convicted of both child abuse by sexual abuse/sexual assault and sexual assault. *See also* Meador v. State, 101 Nev. 765, 771, 711 P.2d 852, 856 (1985) (applying *Blockburger* and concluding that double jeopardy barred appellant's convictions for both lewd acts with a child and sexual assault because proof of a lewd act did not require proof of a fact distinct from the elements of sexual assault since a lewd act necessarily occurred during the sexual assault).

Double jeopardy bars one of the convictions, and we therefore vacate the conviction for child abuse and maintain the convictions for sexual assault. The underlying crime at issue was the sexual assault, and while the child abuse count required proof of an extra element, i.e., that the sexual assault caused physical pain and mental suffering, the extra element did not transform the child abuse charge into the greater crime at issue.

## *The district court abused its discretion in sentencing appellant*

We conclude that the district court abused its discretion in sentencing Troy by (1) using the Lakes Crossing psychological reports as a basis for the sentence and (2) imposing a harsher sentence because Troy maintained his innocence and refused to admit his guilt. However, we conclude that the district court did not abuse its discretion in referring to the post-guilt-phase DNA testing and results.

"A sentencing judge is allowed wide discretion in imposing a sentence; absent an abuse of discretion, the district court's determination will not be disturbed on appeal." Randell v. State, 109 Nev. 5, 8, 846 P.2d 278, 280 (1993). "[I]f the judge relies upon prejudicial matters, such reliance constitutes an abuse of discre-

---

sentences for the same conduct. Talancon v. State, 102 Nev. 294, 298-99, 721 P.2d 764, 767 (1986) (citing Missouri v. Hunter, 459 U.S. 359 (1983)). The legislative history of the statutes at issue gives no indication of whether the legislature authorized separate sentences for sexual assault and child abuse by sexual abuse arising from the same conduct.

tion that necessitates a resentencing hearing before a different judge." Castillo v. State, 110 Nev. 535, 545, 874 P.2d 1252, 1259 (1994).

*The district court's consideration of the Lakes Crossing psychological report was an abuse of discretion*

On February 28, 1994, Troy stipulated to his commitment to Lakes Crossing for psychological evaluation. The court ordered Troy committed to Lakes Crossing to determine whether he was competent to stand trial, was of sufficient mentality to be able to aid and assist in his defense, and was legally sane at the time of the alleged crime.

At the sentencing hearing, the district judge reviewed Troy's psychological reports generated at Lakes Crossing and stated that he was going to consider those reports during sentencing. Based on the Lakes Crossing psychological reports, the district judge stated the following: he believed that Troy was a victim, not because he was falsely accused, but because his parents subjected him to abuse and neglect all of his life; Troy had been convicted of driving under the influence of alcohol two times, and Troy believed the sheriff was trying to pick on him and make an example out of him; Troy was taken for psychological evaluations years earlier because his parents were concerned about his violent behavior when he was intoxicated; according to the psychological test administered at Lakes Crossing, Troy was defensive and unwilling to acknowledge psychological problems, was "immature, egocentric, moody, and insecure," had a "poor self-concept" and a "lack of self-confidence," and was likely to act out sexually; Troy grew up in a dysfunctional family in which "alcoholism, domestic violence, and child abuse were present."

We conclude that the district court's consideration of the Lakes Crossing psychological reports was an abuse of discretion. In Estelle v. Smith, 451 U.S. 454 (1981), the United States Supreme Court concluded that the testimony of a psychiatrist who evaluated a criminal defendant for purposes of competency was improperly used during the penalty phase of a trial. During the penalty phase, the psychiatrist testified regarding information he learned through the psychological examination, stating among other things that the defendant was a sociopath whose condition would only get worse, that the defendant would continue his behavior, and that the defendant had no regard for other human beings' lives. *Id.* at 459.

The jury imposed the death penalty, but the United States Supreme Court reversed the sentence on the grounds that the defendant was entitled to the protection of the Fifth Amendment

at the court ordered psychiatric interview and was not apprised of his right to remain silent. *Id.* at 462. This protection existed even though the psychiatrist's testimony was used only for purposes of punishment and not guilt, because

> [a]ny effort by the State to compel respondent to testify against his will at the sentencing hearing clearly would contravene the Fifth Amendment. Yet the State's attempt to establish respondent's future dangerousness by relying on the unwarned statements he made to [the psychiatrist] similarly infringes Fifth Amendment values.

*Id.* at 463 (footnote omitted).

Nevada cases have utilized a similar analysis. In Esquivel v. State, 96 Nev. 777, 617 P.2d 587 (1980), this court stated that it was improper for the prosecution to impeach a defendant with statements the defendant made during a court ordered mental examination. *Id.* at 778, 617 P.2d at 587. A defendant should feel free in a clinical climate to discuss all relevant facts without fear that those statements may be used against him later; "[f]air play dictates nothing less." *Id.*

In McKenna v. State, 98 Nev. 38, 639 P.2d 557 (1982), this court reversed McKenna's sentence when the prosecutor presented substantive evidence from a psychiatrist who testified that McKenna had admitted during a court ordered psychological examination that he had murdered the victim. This court, citing *Esquivel,* reversed the conviction, stating that it was unfair for the State to appoint a psychiatrist to examine an accused and then employ the confidential contents of that psychiatric interview to obtain a conviction. *Id.* at 39, 639 P.2d at 558; *see also* Winiarz v. State, 104 Nev. 43, 752 P.2d 761 (1988).

Even though these Nevada cases only address the use of a court ordered psychiatrist's testimony in the guilt phase, the United States Supreme Court has stated that it could "discern no basis to distinguish between the guilt and penalty phases of . . . trial so far as the protection of the Fifth Amendment privilege is concerned" and that it is improper to use such psychiatric testimony at either the guilt phase or the penalty phase. *Estelle,* 451 U.S. at 462-63. We realize that *Estelle, Esquivel,* and *McKenna* all concerned the use of the psychological reports in the penalty phase of a first degree murder case and that the instant case concerns the use of such reports in the sentencing hearing of a non-first-degree-murder case; however, the rationale from those cases applies here. *See* Pens v. Bail, 902 F.2d 1464, 1466 (9th Cir. 1990) (in a rape case, unwarned statements given in a psychiatric evaluation about other offenses could not be used to enhance a sentence); State v. Valera, 848 P.2d 376, 382 (Hawaii

1993) ("the use at sentencing of statements previously obtained in violation of a defendant's privilege against self-incrimination violates that defendant's privilege against self-incrimination"). Pursuant to this case law, we conclude that the district judge abused his discretion and that Troy is entitled to a new sentencing hearing. The district judge ordered the psychological examination of Troy and then relied on the conclusions of that exam, including his unwarned statements to the psychiatrist, to determine that Troy was likely to act out sexually and that he was not falsely convicted. Such consideration of the reports violates the "fair play" rules set forth in *Esquivel* and *McKenna* and the Fifth Amendment concerns set forth in *Estelle,* and constitutes reversible error.

*The district court's imposition of a harsher sentence because Troy maintained his innocence and refused to admit his guilt was an abuse of discretion*

During the sentencing hearing, the district judge informed Troy that he was convinced of his guilt and that he believed that Troy's continual declaration of innocence merely enabled Troy to face his parents. The district judge stated that he could show Troy no mercy if Troy continued to profess his innocence and also implied that he was going to give Troy consecutive sentences if Troy did not state that he was guilty and explain his involvement in the events on January 29, 1994. The district judge stated that he was going to take a thirty minute recess so that Troy's counsel could "explain [to Troy] the significance" of what the district judge was trying to convey, and concluded by stating:

> If you are going to continue this status as a victim, if you are not man enough now, and this is not just going to hurt you, it's going to hurt the lives of your brothers, your two brothers' families, your other siblings, and your parents, particularly your mother, who I think has been a victim of a lot of things, like you have, too. . . .
>
> I'm offering you the opportunity to be a man, and to explain exactly what happened that night, and to get it off your shoulders morally, spiritually, and every other way, and to take the burden off your parents' shoulders. I will show you pity if you do that. But if you're going to be—if you show no remorse, if you are unable to be reformed because of your attitude, then I cannot show you any pity.

The court then took a thirty minute recess. When the court reconvened, the district judge asked Troy if he was guilty of the

crime, and Troy stated, "No sir, I'm not." After hearing testimony from Troy's mother, the district judge asked Troy if he had anything to say to the court, and Troy responded:·

> Just that I know that I'm not guilty. I know there was evidence presented that—that convinced 12 honest people of this community that I was, and all I'd like to say is I—I'm not guilty.

The district judge then sentenced Troy to the maximum penalty on Counts II and IV and ordered those sentences to run consecutively.

In Bushnell v. State, 97 Nev. 591, 637 P.2d 529 (1981), the district judge based his sentence on the fact that the appellant maintained his innocence. In overturning appellant's sentence, this court stated:

> [Appellant] had not waived his right to remain silent. A defendant retains his Fifth Amendment rights after a jury verdict because the appellate process is still open to him. Imposition of a harsher sentence based upon the defendant's exercise of his constitutional rights is an abuse of discretion and the sentence cannot stand.

*Id.* at 593, 637 P.2d at 531 (citations omitted); *see also* Thomas v. State, 99 Nev. 757, 758, 670 P.2d 111, 112 (1983) (citing *Bushnell* and concluding that in relying on the fact that the appellant had refused to admit his guilt, the district court abused its discretion in determining a sentence).

The Fifth Amendment states that no person "shall be compelled in any criminal case to be a witness against himself." The district court violated Troy's Fifth Amendment rights by considering his "lack of remorse" when he still had a constitutional right to maintain his innocence and by threatening to impose a harsher sentence if Troy refused to admit his guilt. Troy was unable to express remorse sufficient to satisfy the judge without foregoing his right to not incriminate himself, and the fact that he took the stand at trial does not change this analysis because Troy maintained his innocence. As such, requiring Troy to either express remorse or receive a harsher sentence violated Troy's Fifth Amendment rights and constituted an abuse of discretion. *See Bushnell,* 97 Nev. at 593, 637 P.2d at 531 (stating that "[i]mposition of a harsher sentence based on the defendant's exercise of his constitutional rights is an abuse of discretion").

Therefore, we conclude that the district judge abused his discretion in relying on the fact that Troy refused to admit his guilt when it imposed Troy's sentence, and that Troy should receive a new sentencing hearing.

*The district court's reference to the post-trial DNA testing was not an abuse of discretion*

After the trial but before the sentencing hearing, defense counsel approached the court with a request to allow additional independent DNA testing to give Troy's parents peace of mind about the results of the trial. After discussing the matter with the prosecution and the defense, the district judge appropriated funds for the additional testing. The additional DNA test confirmed that the fluids taken from Jane Doe's underwear matched Troy's DNA and further showed that only 1 in 10,000 people had DNA matching that present in the tested fluids (the DNA test at trial indicated that only 1 in 3,000,000 people had matching DNA). The district judge stated that the result of this additional test was ''simply just further proof of what we already knew from the first DNA testing, that this vicious crime was committed by Troy Don Brown.''

In Goodson v. State, 98 Nev. 493, 495-96, 654 P.2d 1006, 1007 (1982), this court stated that ''an abuse of discretion will be found when the defendant's sentence is prejudiced from consideration of information or accusations founded on impalpable or highly suspect evidence.'' We conclude that the district court did not abuse its discretion in considering the additional DNA tests. Troy's counsel requested the DNA tests and even picked the laboratory which performed the test. Troy now contends that the tests were considered without any evidentiary scrutiny, laying of foundation, or establishment of methods of reliability. However, Troy placed the evidence before the court, had an opportunity to make all of the above-mentioned arguments, and failed to do so. Furthermore, it does not appear that the district judge gave much weight to the test results because he stated that the results only confirmed what he already knew, i.e., that Troy was guilty. Based on these reasons, we conclude that it was not an abuse of discretion for the district judge to consider the additional DNA test results at the sentencing hearing.

## CONCLUSION

The district court's failure to set bail immediately was not so prejudicial to Troy that it constituted reversible error. Furthermore, the DNA evidence was properly admitted at trial, and sufficient evidence existed to convict Troy. However, the double jeopardy clause precluded Troy from being convicted of both sexual assault and child abuse by sexual abuse/sexual assault, and Troy's conviction for child abuse must be vacated. Finally, we conclude that the district judge abused his discretion during the

sentencing phase of the trial and the case must be remanded to the district court for a new sentencing hearing on the remaining sexual assault conviction (Count II).[6]

---

[6]The Honorable A. William Maupin, Justice, did not participate in the decision of this appeal.