BRYAN EUGENE BRAKE, Appellant, v. THE
STATE OF NEVADA, Respondent.

No. 25745

May 22, 1997          939 P.2d 1029

*Michael R. Specchio,* Public Defender, and *John Reese Petty,*
Chief Appellate Public Defender, Washoe County, for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City;
*Richard Gammick, District Attorney, and Gary H. Hatlestad,*
Deputy District Attorney, Washoe County, for Respondent.

## OPINION

*Per Curiam:*

Appellant Bryan Brake was tried and convicted of first degree murder with the use of a deadly weapon for the October 31, 1993 shooting of his stepfather, Michael Miller. Bryan originally told the police that he had killed Michael in self-defense, but then confessed that the killing was premeditated, that he and his mother, Phyllis Miller, had previously discussed killing Michael, and that he had killed Michael because Michael was abusive and was constantly meddling in Bryan's personal affairs.

At trial, Bryan argued that he had killed Michael in self-defense and that he had lied to the police when he had told them that the killing had been premeditated. Bryan was convicted of first degree murder with the use of a deadly weapon and was sentenced to two consecutive life sentences without the possibility of parole. Bryan argues on appeal that the district court erred by substituting an alternate juror once deliberations had begun and not properly admonishing the original jury to discard all prior deliberations and begin anew. Bryan also argues that the district court's consideration during sentencing of his lack of remorse for the murder was an abuse of discretion.

We conclude that the district court properly admonished the jury regarding the deliberations, but that the district court's consideration of Bryan's lack of remorse was improper. Therefore, we affirm Bryan's conviction but remand this case to the district court for a new sentencing hearing before a different district judge.

### FACTS

Bryan was Phyllis' son from a previous marriage and lived in Michael's house with Phyllis and Michael, who were married. On October 31, 1993, Bryan shot and killed Michael sometime

between 7:00 p.m. and 8:00 p.m. Phyllis discovered Michael's body at approximately midnight and called the police. Mike Haley, a detective with the Washoe County Sheriff's Office, arrived at the Miller house at approximately 1:00 a.m. Bryan was staying at a friend's house and called Michael's house sometime after 1:00 a.m.; a police sergeant answered the call and asked Bryan to return to the house because of the crime that had been committed.

Bryan returned home and voluntarily accompanied Haley to the police station. Haley stated that Bryan was not a suspect and that he had merely wanted to inform Bryan of Michael's death away from the residence and to ask Bryan some basic questions about the killing. Haley began interviewing Bryan at the station at approximately 8:00 a.m. on the morning after the murder. Bryan was told that his participation was voluntary and that he could leave at any time, but he answered the questions and began recounting the events of the day of the murder.

Bryan first told Haley that he had no knowledge of the killing, had not seen Michael that afternoon before his death, and had no involvement in the killing. However, it became apparent to Haley that Bryan had returned to the house at some point that afternoon, so he continued the questioning. Bryan then changed his story, indicating that he had killed Michael in self-defense after Michael had threatened to shoot him. After further questioning, Bryan admitted that the killing was premeditated; he had gone to the house with the intent to kill Michael because he was tired of Michael's abuse towards himself and Phyllis and of Michael's constant meddling in his personal affairs.

At trial, the prosecutor's theory, which was based on Bryan's confession, was that the killing was premeditated. The following facts were given in Bryan's confession and were presented at trial. Bryan left a friend's house at 6:30 p.m. and met Phyllis at a bar. Phyllis had been unhappy with her marriage to Michael and wanted to get out of the relationship, but could not do so for financial reasons. Approximately two to four weeks before Michael was killed, Bryan and Phyllis had discussed killing Michael by poisoning him, electrocuting him, placing a bomb in his car, or shooting him; on the day that Michael was killed, they had again discussed shooting Michael. Bryan had thought about killing Michael all day and had gone to Michael's house with the intent to kill him. Bryan arrived at Michael's house, took a comforter out of his car, went into Michael's bedroom and got a .357 magnum pistol out of the closet, wrapped the gun in the comforter, and confronted Michael. The first shot went off unexpectedly and did not hit Michael; Bryan then fired two more shots, one of which hit Michael in the back near the shoulder. Bryan then dropped the gun, ran back into Michael's room and

got a .38 caliber pistol, returned, and shot Michael in the back of the head with that gun. Bryan then returned to the bar and told Phyllis what he had done.

At trial, however, Bryan's theory of defense was that he had killed Michael in self-defense and that he had lied to the police when he told them that the killing had been premeditated. Bryan testified that after working at the house with Michael in the morning, he ran some personal errands and then went to a friend's apartment. He left the apartment at about 6:30 p.m. and went to meet Phyllis at a bar in order to borrow money for gas. Phyllis did not have any money, so Bryan went to the house to see if he could find any change; he had also planned to get a ring for Christina Johnston, a woman he was dating, that his mother had been holding for him in her jewelry box. Michael was at the house when Bryan arrived. Bryan went into his mother's room to get the ring, and Michael asked him what he was doing. When Bryan told Michael that he was getting the ring to give to Johnston, Michael got angry and began throwing the drawers of the jewelry box on the floor because he did not approve of Bryan's relationship with Johnston.

After Michael dumped all of the jewelry on the floor, Bryan grabbed a handful of rings off the floor and took them out to his truck. Michael told Bryan to come back into the house because he wanted to talk to him. Bryan grabbed a comforter out of his truck to put back in the house, and when he reentered the house, Michael had a gun sitting on the edge of the table next to him and began berating Bryan again about dating Johnston.

At that point, Michael picked up the gun and pointed it at Bryan and Bryan pulled the comforter from under his arm, wrapped it around Michael's wrist, and pushed his wrist away. When Bryan did this, a shot fired. Michael tried to point the gun at Bryan again, and another shot fired. Bryan tried to knee Michael in the side, but Michael pushed him down and a struggle ensued. Bryan testified that because he was scared he ran into the bedroom and found another gun.

Bryan testified that when he came back into the living room, Michael pointed the gun at him again and pulled the trigger. Bryan heard the gun "click" and no bullet was fired. He ran toward Michael, kneed him in the face, and hit him with the gun. Bryan stated that Michael fell to the ground, still holding the pistol, but then made motions as if he were going to get up again. Fearing that Michael was going to shoot him, Bryan shot Michael.

Bryan also testified that his childhood was replete with child abuse and that as a result of that abuse he had developed a defense mechanism of telling authority figures what they wanted to hear

in order to prevent being beaten or getting in trouble. He stated that the police had not believed that he had acted in self-defense and that they had wanted him to say that his actions were premeditated; therefore, he told the police the fabricated story that he and his mother had planned the killing and that he had acted with premeditation. Bryan also testified that Michael had pointed a gun at him at least four other times and at Phyllis several times, threatening to kill both of them, and that Michael had stalked him repeatedly.

Bryan's case was submitted to the jury for deliberations on March 8, 1994. The next day, counsel stipulated to allow one of the jurors to be excused and replaced with an alternate juror. Upon substituting the alternate juror, the district court told the jury members that they were to begin deliberations anew. A few hours after deliberations began with the alternate juror, the jury returned a guilty verdict. At sentencing, the district court followed the State's recommendation and sentenced Bryan to two consecutive life sentences without the possibility of parole, indicating that the sentence was appropriate because Bryan had showed a lack of remorse for his actions.

## DISCUSSION

*The district court properly instructed the jury regarding beginning deliberations anew after the alternate juror was seated.*

After placing the alternate juror on the jury panel, the district court stated:

> The rest of the jury as it is now composed may now return to the jury room. You did some work last night, and that was with Mrs. Venne. You must redo some of that work, all of that work actually with Mrs. Morrill and allow her to begin deliberations anew. It may not take quite as long to go back over everything, but you must do that as you are starting afresh. So that she can be part of those deliberations from the very beginning.

NRS 175.061(3) states that "[i]f an alternate juror is required to replace a regular juror after the jury has retired to consider its verdict, *the judge shall recall the jury, seat the alternate and resubmit the case to the jury.*" (Emphasis added.) In Carroll v. State, 111 Nev. 371, 373, 892 P.2d 586, 587 (1995), we indicated that such a rule was necessary to relieve the potential pressure placed on the new juror from the original jury members to reach a conclusion that they may have agreed on during prior deliberations.

We conclude that the district court's instruction properly informed the jury that they were to begin the deliberations anew with the alternate juror. The district court instructed the jury members that they had to redo all of their work from the previous evening with the new juror and begin their deliberations anew. Additionally, the district court told the jury members that they must start anew so that the substituted juror could be part of the deliberations from the very beginning. Therefore, the instruction clearly informed the jury members that the case had been resubmitted to them and that deliberations had to be started anew, not just resumed.

*The district court's consideration of Bryan's lack of remorse at sentencing was an abuse of discretion.*

Pursuant to NRS 175.552, the parties agreed to have the district judge impose Bryan's sentence. The district court followed the State's recommendation and sentenced Bryan to two consecutive life sentences without the possibility of parole, stating:

> [Y]our lack of remorse, your lack of insight into what you have actually done, . . . there is no lack of insight into how it is going to affect you, Mr. Brake, but there is a lack of insight as to how this affected others and how it has affected your victim. For that, your lack of remorse, this Court reaches the conclusion that the recommendation of the State is appropriate.

"A sentencing judge is allowed wide discretion in imposing a sentence; absent an abuse of discretion, the district court's determination will not be disturbed on appeal." Randell v. State, 109 Nev. 5, 8, 846 P.2d 278, 280 (1993). "[I]f the judge relies upon prejudicial matters, such reliance constitutes an abuse of discretion that necessitates a resentencing hearing before a different judge." Castillo v. State, 110 Nev. 535, 545, 874 P.2d 1252, 1259 (1994).

This court recently addressed a similar situation in Brown v. State, 113 Nev. 275, 934 P.2d 235 (1997). In *Brown,* the appellant was convicted of sexually assaulting a young girl, but he denied committing the crime. At sentencing, the district court imposed the maximum sentence on appellant based on the fact that the appellant did not admit guilt and show remorse for his acts. We concluded that the district court's consideration of appellant's refusal to admit guilt and show remorse violated appellant's Fifth Amendment right to not be compelled to be a witness against himself because appellant had maintained his

innocence and, therefore, "was unable to express remorse without foregoing his right to not incriminate himself, and the fact that he took the stand at trial does not change this analysis because [appellant] maintained his innocence." *Id.* at 291, 934 P.2d at 246 (citing Bushnell v. State, 97 Nev. 591, 593, 637 P.2d 529, 531 (1981)).

We conclude that *Brown* governs this case also. While Bryan admitted at trial that he had killed Michael, he did not admit that he had done so with premeditation, i.e., he maintained that he was not guilty of first degree murder. Bryan's theory at trial was that he had killed Michael in self-defense; as such, he had maintained his innocence of the crime for which he was ultimately convicted and was unable to express remorse and admit guilt to first degree murder without foregoing his right to not incriminate himself. Therefore, the district court's consideration of Bryan's "lack of remorse" after he had maintained his innocence violated Bryan's Fifth Amendment rights and constituted an abuse of discretion. *See Bushnell,* 97 Nev. at 593, 637 P.2d at 531 (stating that "[i]mposition of a harsher sentence based on the defendant's exercise of his constitutional rights is an abuse of discretion").

Furthermore, we conclude that the consideration of Bryan's lack of remorse cannot be considered harmless error. Testimony indicated numerous mitigating circumstances: Bryan had no prior criminal record, suffered a considerable amount of mental and physical abuse as a child, and appeared to have been manipulated by his mother to commit the crime. Therefore, it appears that the district court's consideration of Bryan's lack of remorse likely resulted in the harshest possible sentence being assessed.

We conclude that the district court abused its discretion in relying on the fact that Bryan refused to admit his guilt and show remorse when it imposed the sentence, and that Bryan should receive a new sentencing hearing before a different district judge.

## CONCLUSION

The district court's instructions to the jury to begin deliberations anew was proper. However, the district court's consideration during sentencing of Bryan's lack of remorse was an abuse of discretion. Therefore, we affirm Bryan's conviction for first degree murder with the use of a deadly weapon, but vacate his sentence and remand this case to the district court for a new sentencing hearing before a different district judge.[1]

---

[1]THE HONORABLE A. WILLIAM MAUPIN, Justice, did not participate in the decision of this matter.

SHEARING, C. J., concurring in part and dissenting in part:

I would affirm the conviction and sentence of Bryan Brake. I do not believe that considering Brake's lack of remorse in the sentencing was error. This case is quite different from Brown v. State, 113 Nev. 275, 934 P.2d 235 (1997) on which the majority relies. In *Brown,* the defendant denied any involvement in the crime. Yet, the district judge announced that the defendant would get less than the maximum penalty only if he admitted the offense. This court reversed the sentence on the ground that the defendant had a right to remain silent.

In contrast, Brake *admitted* killing the victim. The only question was whether or not the killing was in self-defense. Even if the killing had been in self-defense, Brake's lack of remorse would have been a legitimate consideration of the sentencing judge. Brake's claim of self-defense and a feeling of remorse are not in conflict. Thus, unlike *Brown,* Brake's right to remain silent is not implicated. The sentencing judge may legitimately consider a defendant's lack of feeling about killing a fellow human being, when the defendant admits to the killing.