102 P.3d 606 (2004)
Robert Lee MCCONNELL, Appellant,
v.
The STATE of Nevada, Respondent.
No. 42101.
Supreme Court of Nevada.
December 29, 2004.
*611 Michael R. Specchio, Public Defender, and Cheryl D. Bond, Deputy Public Defender, Washoe County, for Appellant.
Brian Sandoval, Attorney General, Carson City; Richard A. Gammick, District Attorney, and Terrence P. McCarthy, Deputy District Attorney, Washoe County, for Respondent.
Before the Court En Banc.[1]

OPINION[2]
PER CURIAM.
This is an appeal from a judgment of conviction of first-degree murder, pursuant to a guilty plea, and from a sentence of death, pursuant to a jury verdict. Appellant Robert Lee McConnell shot Brian Pierce to death in August 2002. The State charged McConnell with murder and sought the death penalty. After his preliminary examination, McConnell was allowed to represent himself. He then pleaded guilty. He presented a case in mitigation at his penalty hearing, but the jury returned a sentence of death. Initially, he moved to waive his appeal but eventually authorized his appointed counsel to fully brief all issues on appeal.
McConnell challenges the propriety of his penalty hearing and death sentence on various grounds. The most significant question raised is: in a prosecution seeking death for a felony murder, does an aggravator based on the underlying felony constitutionally narrow death eligibility? We conclude that it does not, but because McConnell admitted to deliberate, premeditated murder, the State's alternative theory of felony murder was of no consequence and provides no ground for relief.

FACTS
On August 7, 2002, McConnell shot Brian Pierce to death. Pierce lived with and planned to marry April Robinson, McConnell's former girlfriend. McConnell broke into the couple's home while they were at work. When Pierce returned and entered his front door, McConnell shot him repeatedly. Later, when Robinson came home, McConnell threatened her with a knife, handcuffed her, and sexually assaulted her. He then kidnapped her, forcing her to drive to California. Robinson was able to escape and alerted authorities. McConnell was later arrested in San Francisco.
The State charged McConnell with first-degree murder, alleging theories of deliberate, premeditated murder and of felony murder during the perpetration of a burglary. The State also charged him with sexual assault and first-degree kidnapping. After the preliminary hearing, the State filed a Notice of Intent to Seek Death Penalty and alleged three aggravators: the murder was committed during the course of a burglary, was committed during the course of a robbery, and involved mutilation. Before trial, McConnell successfully moved to represent himself; the Public Defender served as standby counsel thereafter. McConnell then pleaded guilty, without benefit of a plea agreement, to sexual assault and first-degree *612 kidnapping; judgment was entered accordingly, and he was sentenced to consecutive terms of life imprisonment with the opportunity of parole. He also pleaded guilty to first-degree murder, and a penalty hearing before a jury was set.
McConnell's penalty hearing began on August 25, 2003, and lasted four days. In his opening statement, McConnell said that he believed that the evidence would show four mitigating circumstances: he was acting under extreme emotional distress at the time of the murder; he had accepted responsibility for the crimes by pleading guilty; he had no significant prior criminal history in the way of violent felonies; and his behavior in custody was good.
The evidence at the hearing showed that Robinson met McConnell in Reno in 2000, and the two began dating. She broke up with him in the spring of 2001 and about eight months later became engaged to Pierce. Threats were exchanged between the couple and McConnell, and Robinson obtained a temporary protective order against McConnell.[3] After breaking up with Robinson, McConnell told another girlfriend, Lisa Rose, that he was going to murder Pierce. Rose was so concerned that she twice notified the Secret Witness Program and also contacted Robinson. McConnell eventually left the Reno area.
About a year later, McConnell returned to the area. On August 4, 2002, he contacted his former roommate, Alejandro Monroy. When the two men met, Monroy noticed that McConnell was still fixated on Robinson and displayed aggression toward her. Monroy tried to persuade McConnell to let his feelings for Robinson go and to grow up.
Three days later, when Robinson came home from work at around 4:30 p.m., she noticed some unusual things. The window blinds were closed, a golf-ball-sized hole was in the outside paneling, and a blanket was lying in front of the door inside the house. Most unusual of all, however, was that her fiance, Brian Pierce, did not come outside to greet her. A few seconds after entering her home, Robinson saw a man dressed in black holding a knife. It took her a moment to realize that the man was McConnell, whom she had not heard from in months.
McConnell told Robinson, "Just shut the fuck up." He grabbed her arm, forced her into the master bedroom, threw her facedown on the bed, and handcuffed her. He then placed her on a couch and began talking to her. About 20 minutes later, McConnell cut Robinson's shirt and bra off with the knife and took off her pants and panties. Placing her facedown on the bed again, he duct taped her arm to her leg, duct taped her eyes and mouth, and placed a towel over her head. He then sexually assaulted her vaginally, anally, and orally with his finger and penis.
Afterwards, McConnell asked Robinson for money, and she gave him seven dollars. Robinson then got dressed, and McConnell told her that if she made any wrong moves he was going to shoot her in front of her neighbors. She saw that he had a gun in a holster with two magazine clips and believed him. She also saw that he had a wallet and car keys that appeared to belong to Pierce. When she asked about Pierce, McConnell told her that Pierce was locked up in a U-Haul, being watched by other people. McConnell said that she would have to take him to California if Pierce was ever going to be set free.
Robinson and McConnell drove to California in her car. He told her that everything that was occurring was a part of his plan. She realized that McConnell "had been keeping track of ... when Brian and I went to work, when we got home, the activity at the house, our cars, where they were parked, how many dogs we had, where we sat in the house." As they approached San Francisco, Robinson began suspecting that Pierce was not a hostage and that McConnell was eventually *613 going to kill her. After they stopped at a gas station, she was able to escape in the car. Robinson drove to a nearby hospital and contacted the police in San Mateo, California. She gave the police McConnell's backpack, which contained items such as a 9-millimeter semiautomatic handgun, bullet magazines, and handcuffs.
Early the next morning, on August 8, Washoe County Sheriff's Deputies responded to the reported kidnapping and sexual assault and arrived at Robinson's home. After kicking in the door and entering, the deputies found Pierce dead. He had suffered several gunshot wounds, and a knife was stuck in his torso. Underneath the knife was a videocassette entitled "Fear."
Dr. Christine Elliot, a forensic pathologist, performed an autopsy on Pierce's body. Pierce had suffered nine gunshot wounds. One gunshot wound behind his ear "appeared to be very close range or contact in nature." He had also suffered three stab wounds. Two stab wounds were the "most superficial," and a knife was still in the third wound. The lack of bleeding into the stab wounds suggested that they occurred postmortem. Pierce died from massive blood loss from the gunshot wounds.
Before his arrest, McConnell called his brother, Darren Bakondi, and asked him to send "money, things of that nature." Bakondi testified that McConnell was "kind of rambling" during the conversation: "He told me maybe he should kill himself. Or he said he might go out in a blaze of glory, maybe make the cops  maybe take a couple of them with him, or hopefully some kind of shootout or something."
Less than a week after the crimes, McConnell was arrested in San Francisco. He was extradited back to Nevada. While in custody, he made a number of drawings, had some recorded telephone conversations, and wrote a number of letters. These items were admitted as evidence against him. One item was a letter he wrote to Robinson after she testified at his preliminary hearing. The letter had a cover sheet with "Rest in peace" and "1977-2002" (the years of Pierce's birth and death) written on it. The letter read in part:
I hope this letter finds you before you kill yourself. Just think. Now you can be with your mom and Brian forever. That was some performance last Thursday. You almost had me feeling sorry for you.
You should thank me, you know. I could get into your house anytime I wanted. Just think. Brian would still be alive if you had locked that window. How does that really make you feel, April? Late at night, alone, when you cry yourself to sleep. Yes, it is a nightmare. And it won't end until you finish the job on your arm.
The last sentence referred to an earlier attempt by Robinson to commit suicide. She, however, never received the letter. (Other items admitted into evidence will be discussed below.)
At the time of his murder, Pierce was 26 years old, attending college and studying graphic design. His younger sister, Kristine Pierce, testified that he had many friends. She loved him and looked to him for guidance. She described Pierce as "a brave person and a real man." Pierce's mother, Pam McCoy, spoke of her pride for her only son and stated, "He never spoke hurtful words. He was loyal. He was a loving son."
Pierce's stepmother, Sheryl Pierce, described Pierce as "a great kid" who held a Bible study class in his bedroom every week while growing up. She thought of him every day. Mrs. Pierce also described two telephone calls she received one night at home after the murder. In the first call, when she heard McConnell say his name on her answering machine, she broke the connection. McConnell called back about a minute later and said on her machine, "Your son died like a coward." Mrs. Pierce was "absolutely horrified" and "couldn't imagine why anyone would be so cruel and mean as to call someone he doesn't even know just to cause that kind of pain."
McConnell called three witnesses. His longtime best friend, Luis Vasquez, who managed a Reno car dealership, described McConnell as one of the best car salesmen he ever had. Vasquez took family vacations with McConnell and trusted him to baby-sit *614 his children. Before the crimes, Vasquez told McConnell to "walk away" from his feelings for Robinson. He described McConnell as being "very, very depressed," and added that McConnell was crying and, at times, suicidal.
Misty Tackman, a receptionist at the car dealership where McConnell had worked, testified that Robinson once cursed at her and threatened to kill her with a knife.
Cassandra Gunther, the mother of McConnell's daughter, testified that she became pregnant in 1999 when she was 19 years old. McConnell pressured her into keeping the child, once threatening her life. Gunther ended the relationship, the child was born, and Gunther married another man. As Gunther wanted, McConnell had nothing to do with his daughter after the birth.
McConnell testified on his own behalf. He declined to give specific details about his childhood but stated that he and his mother did not get along. He said that he did not want to make excuses for his behavior because many people have bad experiences growing up. He added, "Everything I'm saying now is for the benefit of the Robinson and Pierce family." McConnell testified that initially his relationship with Robinson was great, but after he caught her cheating, things went downhill. She started spending time with Pierce, and McConnell began to get jealous and perceive Pierce as a threat. Threats between McConnell and Pierce were made "back and forth," but Pierce "wouldn't fight."
McConnell stated:
I attempted to leave town, get away, because there was an instant where I was  I'm going to do something right now. I'm going to kill these people right now....
....
I should have got the counseling maybe to deal with some other issues. I never did.
And, you know, at some point I just  I don't want to say snap. It wasn't instantaneous, you know. I came back with a plan to murder. I did. When I crossed country, I came back, this is about revenge. I'm going to get these people, Brian, April.... And in my mind the war is on. The words have been said. The threats on both sides. So I am justified in whatever I do because, you know, they shouldn't have messed with me; they shouldn't have talked shit to me.
And but then there was the other side where, you know, what the hell are you doing? And I would go back and forth....
....
At some point on August 7th I did all the things they said.... You know, I was just kind of aimless, wandering around. But all of a sudden I became focused, and I did, and I just made the decision I'm going to do this. I'm going to retaliate against the people that ruined my life.
McConnell also said that
I can't believe that I killed a Christian.... And to find out that I took the life of a person that goes to church and all this stuff that I find out, it hurts me now.
At the time, yeah, very lack of remorse. I was pissed off. I admit to making those phone calls, the drawings on the wall. That was done absolutely, you know, on purpose....
....
But in  with respect to this murder, ... I'm the coward. I ambushed Brian. He had no chance. Because of perceived threats or whatever, whatever I told myself for justification, you know, I took his life. You know, there's no excuse for that. And I have to answer to everybody.
He added, "I am sorry for what I did now. I really am."
Under cross-examination, McConnell described Pierce's murder on August 7. He had been watching Robinson's and Pierce's house with binoculars for two days before the murder. The morning of the murder, wearing a police-issue battle dress uniform, he broke into the house through an open window and took such things as bills, pictures, and notes to see what Robinson and Pierce had been doing.
McConnell reentered the home at around 12:20 p.m. and waited, determined to kill *615 Pierce when he came home. Once Pierce came in the door, McConnell pointed his gun at him and said, "Give me your wallet." Pierce threw his wallet toward McConnell and reached for the door. McConnell fired his gun ten times. He approached Pierce because he wanted to look into his eyes to see him die. He then dragged Pierce's body into a bedroom and cut into it two or three times to dig out a "Black Talon" bullet to see what one looked like inside a body. McConnell then stuck a knife into Pierce's torso because he was "still mad." He placed the videotape "Fear" that he found at the house on the body as a message for Robinson. He also took credit cards out of Pierce's wallet.
McConnell explained that his actions were the result of emotional duress. Because this duress continued even after he was in custody, he boasted of murdering Pierce and took pleasure in making Pierce's family suffer. McConnell said he had since had a change of heart, but he also admitted that violence was still in his nature.
The jury found all three aggravating circumstances, determined that any mitigating circumstances were insufficient to outweigh the aggravating circumstances, and returned a verdict of death.

DISCUSSION

The constitutionality of Nevada's use of lethal injection
McConnell contends that Nevada's use of lethal injection as the method of execution is unconstitutional. Due to the absence of detailed codified guidelines setting forth a protocol for lethal injection, he argues that Nevada has failed to ensure that executions are not cruel and unusual punishment prohibited by the United States Constitution. Without codified guidelines, he argues, there is the potential for either accidentally "botched" executions or intentional abuse by Department of Corrections officials who could gratuitously inflict pain during the execution procedure. We are not persuaded by these arguments.
Nevada executed prisoners by means of lethal gas until 1983, when the Legislature changed the authorized method of execution to lethal injection.[4] NRS 176.355(1) provides that a sentence of death in Nevada "must be inflicted by an injection of a lethal drug." NRS 176.355(2)(b) requires the Director of the Department of Corrections to "[s]elect the drug or combination of drugs to be used for the execution after consulting with the State Health Officer."[5] "[S]tatutes are presumed valid, and the burden is on the person challenging the statute to prove it is unconstitutional" through "a `clear showing of invalidity.'"[6]
McConnell cites no authority from this or any other jurisdiction that deems lethal injection unconstitutional as a matter of law because of the absence of detailed codified guidelines for the procedure. He cites a single law review article criticizing lethal injection,[7] but provides no specific facts or allegations indicating that executions in Nevada have either accidentally or intentionally been administered in a cruel or unusual manner. Rather, McConnell's argument largely consists of speculative accusations, and he cites no part of the record where he challenged the constitutionality of lethal injection before the district court.[8] McConnell's claim raises fact-intensive issues which require consideration by a fact-finding tribunal and *616 are not properly before this court in the first instance.[9]
To the extent that McConnell argues that the statutes mandating lethal injection are unconstitutional on their face, we reject that argument. More than 80 years ago in State v. Jon,[10] this court rejected an almost identical claim challenging execution by lethal gas. In Jon, the appellants challenged their execution by lethal gas on the basis that Nevada's statute authorizing execution[11] by lethal gas was "indefinite and uncertain as to the formula to be employed" and therefore constituted cruel and unusual punishment.[12] The appellants contended that this court "must take judicial notice of facts and conclusions reached as the result of scientific research, and ... declare that the law in question provides a cruel and inhuman method of enforcing the death penalty."[13]
This court rejected the appellants' argument:
It is true that the [death] penalty has been inflicted in different ways; for instance, by hanging, by shooting, and by electrocution; but in each case the method used has been to accomplish the same end  the death of the guilty party. Our statute inflicts no new punishment; it is the same old punishment, inflicted in a different manner, and we think it safe to say that in whatever way the death penalty is inflicted it must of necessity be more or less cruel.
But we are not prepared to say that the infliction of the death penalty by the administration of lethal gas would of itself subject the victim to either pain or torture....
... We must presume that the officials intrusted with the infliction of the death penalty by the use of gas will administer a gas which will produce no such results, and will carefully avoid inflicting cruel punishment. That they may not do so is no argument against the law.
... The legislature has determined that the infliction of the death penalty by the administration of lethal gas is humane, and it would indeed be not only presumptuous, but boldness on our part, to substitute our judgment for theirs....
... The present statute provides that the judgment of death shall be inflicted by the administration of lethal gas, and that a suitable and efficient inclosure and proper means for the administration of such gas for the purpose shall be provided. We cannot see that any useful purpose would be served by requiring greater detail.[14]
The reasoning in Jon remains sound and applies to McConnell's claim. We therefore deny McConnell relief on this issue.

The admission of character evidence during the penalty hearing
McConnell contends that the district court improperly admitted several pieces of "bad act" evidence against him during the penalty hearing. He calls the evidence irrelevant, inflammatory, and more prejudicial than probative. He also contends that the evidence was improper because it did not prove any aggravating circumstance. We conclude that the evidence was properly admitted.
"The decision to admit particular evidence during the penalty phase is within the sound discretion of the district court and will not be disturbed absent an abuse of that discretion."[15] Evidence that does not prove an aggravating circumstance is still admissible if it relates to the offense, the defendant, or the victim and its probative value is not substantially outweighed by the danger of unfair prejudice.[16] The jury must be instructed *617 that such evidence is "other matter evidence" which cannot be considered initially in determining whether the defendant is death eligible but only, after that determination is made, in deciding the appropriate sentence.[17]
The evidence that McConnell challenges falls into three categories: photographs of drawings he made and taped to his prison cell wall, recordings of telephone conversations he had with his father and a former roommate, and portions of a letter he wrote to another inmate.
McConnell had several drawings hanging in his cell, and photographs of these drawings were admitted into evidence. These drawings included a picture of a man (apparently the victim, Pierce) with his face crossed out and the phrases "Fuckin' coward" and "See you in hell, faggot" written on it. Another drawing depicted a "Black Talon" bullet entering Pierce's head. McConnell unsuccessfully objected to their admission into evidence.
Two audiotape recordings contained portions of conversations McConnell had while in custody: one with his father, the other with his former roommate. McConnell said, among other things, "I was going to cut his [Pierce's] head off," "I got him ten times before he could even hit the ground," and "I'll just kill people from here on out." McConnell apparently boasted of his satisfaction in committing the crimes and his intent to control the criminal justice system. McConnell also objected unsuccessfully to admission of the recordings.
A letter McConnell wrote while he was in prison to another inmate was admitted into evidence. During redirect examination of April Robinson, the prosecutor read the following portion of the letter: "So don't patronize me or try to coerce, bribe or threaten to testify against me. You wanna get out  I don't. I could care less about anything else that I'm charged with. I enjoy my [victim's] pain and suffering. It makes my job worth it that much more." The prosecutor asked Robinson, "Is that more the defendant you know?" She replied, "Yes." McConnell did not object that the letter was unfairly prejudicial; therefore, he must establish that any error in admitting it was plain and affected his substantial rights, i.e., was prejudicial.[18] We see no error in regard to any of the evidence.
The drawings, recordings, and letter concerned McConnell's attitude toward his victims. They were relevant and probative of his cruel and violent character and lack of remorse. Although this evidence was obviously prejudicial, it was not unfairly so because of its probative value. The jury could properly consider the items as "other matter evidence" of McConnell's character in considering whether to sentence him to death. And the jury was instructed correctly under Evans v. State[19] regarding the proper use of evidence presented at a capital penalty hearing. (Instruction no. 20.) The evidence was also relevant, at least in part, to rebut McConnell's evidence of mitigation  his assertion that he felt remorse for the victims. Therefore, McConnell has failed to show that the district court abused its discretion by admitting the evidence.

Claims of prosecutorial misconduct
McConnell contends that he was denied a fair penalty hearing because of prosecutorial misconduct. He claims that the State made several improper remarks to the jury that exacerbated the prejudicial nature of evidence admitted against him. We find no merit in this claim.
"To determine if prejudicial prosecutorial misconduct occurred, the relevant inquiry is whether a prosecutor's statements so infected the proceedings with unfairness as to make the results a denial of due process."[20] *618 This court will not lightly reverse a criminal conviction" `on the basis of a prosecutor's comments standing alone."'[21]
When McConnell moved to exclude the evidence of his drawings and phone calls, he argued that the evidence was overly prejudicial and was "just going to piss off the jury." The prosecutor responded that "everythingI  or we present during this penalty phase will be, to quote Mr. McConnell, to piss off this jury." The prosecutor also stated that the evidence was probative as well as prejudicial and "we're going to try to prejudice him with this jury." These remarks, McConnell argues, prove that prosecutorial misconduct occurred, and he repeatedly underscores his other contentions of misconduct by referring to these remarks. But the essential objective of the prosecution during a penalty hearing is to convince jurors that the defendant deserves to be sentenced to death.[22] This objective is obviously "prejudicial" to the defendant, but the State's tactics must not be unfairly prejudicial. Here, even though the prosecutor was responding to and employing McConnell's own words, the language was unnecessary and unsuitable for the courtroom. However, the remarks occurred outside the presence of the jury and did not betray an improper motive or tactic. We conclude that they were not misconduct and did not prejudice McConnell.
McConnell next contends that the State committed misconduct when it remarked on and emphasized his lack of remorse. However, he failed to object on this ground. Therefore, to warrant relief from this court, he must establish that the error was plain and affected his substantial rights.[23] He fails to show any error. McConnell relies on Brake v. State, where this court held that the district court violated a defendant's Fifth Amendment right against self-incrimination by considering the defendant's lack of remorse in its sentencing decision.[24] In Brake, however, the defendant maintained his innocence.[25] Here, McConnell pleaded guilty and professed remorse. The State did not rely on any silence on his part to argue lack of remorse; rather, it pointed to McConnell's actions and statements after the murder. Consideration of this issue in the penalty phase did not implicate his Fifth Amendment right against self-incrimination.
Next, McConnell contends that the State committed misconduct by asking him on cross-examination if he had acted "like a terrorist." He also complains that the State improperly asked his brother if McConnell said, "Leave it to a wop to bring a knife to a gunfight."[26] His brother conceded that McConnell made the statement. McConnell objected to neither question, and there was no plain error in either instance.[27] He also did not object to a remark referring to his "legacies of tragedy" or to evidence and argument regarding a handcuff key he possessed after his arrest, and we discern no misconduct.

The proper scope of the testimony of the sexual assault victim and victim impact testimony regarding special occasions
McConnell contends that April Robinson improperly testified about the details of her sexual assault and kidnapping. He *619 maintains that this testimony, regarding crimes to which he had already pleaded guilty, was irrelevant in his penalty hearing for the murder of Pierce. He further contends that the testimony violated the position the State took during a pretrial hearing when the prosecutor stated that Robinson was "not going to testify about the sexual assault." Robinson did testify in detail about her sexual assault and kidnapping. However, the State clarified its position later in the pretrial hearing and expanded the anticipated scope of Robinson's testimony. But regardless of the State's pretrial representations, McConnell did not object to the testimony and therefore waived the issue for appellate review absent a showing of plain error.[28] He fails to show any error.
The State argued and the evidence showed that McConnell killed Pierce out of jealousy and revenge because he was Robinson's fiance. McConnell's sexual assault and kidnapping of Robinson almost immediately after the murder were sufficiently connected to Pierce's murder to be both relevant and more probative of McConnell's character and motives for the murder than unfairly prejudicial. Therefore, Robinson's testimony was admissible "other matter" evidence.[29]
McConnell also contends that the penalty hearing was rendered fundamentally unfair because victim impact testimony referred to such events as birthdays, holidays, and the anticipated wedding of Robinson and Pierce. McConnell acknowledges that the State itself did not make these remarks but contends that the State improperly coaxed the victims into doing so. This argument is meritless.
"This court has repeatedly held that so-called `holiday' arguments are inappropriate ... [because they] `have no purpose other than to arouse the jurors' emotions."'[30] McConnell cites to five instances where Pierce's stepmother and mother testified about special occasions such as birthdays, holidays, and the anticipated wedding. He must demonstrate plain error because he did not object to any of this testimony.[31] He fails to demonstrate any error. Nothing in the questioning supports his contention that the State coaxed unfairly prejudicial responses from the victims. Rather, the victim impact testimony was appropriate and within its permissible bounds.

The failure to bifurcate the penalty hearing
McConnell argues that the penalty hearing should have been bifurcated. We have rejected this argument before, most recently in Johnson v. State.[32] McConnell asserts that Johnson did not consider the United States Supreme Court's relatively recent decision in Ring v. Arizona.[33] In Johnson, we did consider Ring's impact on Nevada's capital sentencing scheme.[34] Though we did not apply Ring to the bifurcation issue, McConnell fails to explain how it has any such application. Additionally, as previously discussed, the jury in this case received an appropriate instruction on the use of the evidence admitted during the penalty hearing. We presume that juries follow the instructions they are given,[35] and McConnell has not demonstrated otherwise in his case.

*620 Basing an aggravating circumstance on the predicate felony in a capital prosecution of a felony murder

McConnell argues that the aggravating circumstance based on burglary failed to perform its constitutional function of narrowing death eligibility because the burglary also served as an element of felony murder. The State failed to respond to this argument.[36] We conclude that the argument has merit.
In charging McConnell with first-degree murder, the State alleged two theories: deliberate, premeditated murder and felony murder during the perpetration of a burglary. McConnell was advised of both theories when he pleaded guilty. During his testimony, McConnell admitted that he had premeditated the murder: "Nothing justifies cold-blooded, premeditated, first-degree murder, which is what I did." His other testimony and the evidence as a whole overwhelmingly supported this admission. McConnell's conviction for first-degree murder is therefore soundly based on a theory of deliberate, premeditated murder. Consequently, our ensuing analysis and decision do not invalidate the use of the felony aggravating circumstances in this case.
This court first addressed the contention that in a felony-murder prosecution the underlying felony cannot be considered as an aggravating circumstance in Petrocelli v. State in 1985.[37]Petrocelli rejected that contention primarily because "the U.S. Supreme Court has implicitly approved the use of the underlying felony in felony murder cases as a valid aggravating circumstance to support the imposition of the death sentence," though neither Supreme Court opinion cited addressed the issue.[38] We have followed Petrocelli's rationale since.[39] But we have never addressed the 1988 Supreme Court case Lowenfield v. Phelps,[40] which dealt with a challenge to a death sentence on the basis that the sole aggravating circumstance was identical to an element of the capital murder.[41] We conclude that Lowenfield provides the basic analytic framework to approach this issue.[42]
The Eighth Amendment prohibits the infliction of cruel and unusual punishments.[43] In 1972, the Supreme Court held that capital sentencing schemes which do not adequately guide the sentencers' discretion and thus permit the arbitrary and capricious imposition of the death penalty violate the Eighth and Fourteenth Amendments.[44] As a result, the Court has held that to be constitutional a capital sentencing scheme "must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify *621 the imposition of a more severe sentence on the defendant compared to others found guilty of murder."[45] We conclude that Nevada's own constitutional bans against the infliction of "cruel or unusual punishments" and the deprivation of life "without due process of law" require this same narrowing process.[46]
The Court applied this tenet to Louisiana's capital punishment scheme in Lowenfield.[47] Although Lowenfield did not specifically address felony murder, it considered a case where the only aggravating circumstance found by the jury was identical to an element of the capital crime.[48] The jury convicted Lowenfield of first-degree murder for killing a human being when "the offender has specific intent to kill or to inflict great bodily harm upon more than one person;" the jury then found a single aggravating circumstance that "the offender knowingly created a risk of death or great bodily harm to more than one person" and returned a verdict of death.[49]
The Supreme Court concluded that the narrowing function required by the Constitution had been accomplished.[50] The Court explained that
the narrowing function required for a regime of capital punishment may be provided in either of these two ways: The legislature may itself narrow the definition of capital offenses, as Texas and Louisiana have done, so that the jury finding of guilt responds to this concern, or the legislature may more broadly define capital offenses and provide for narrowing by jury findings of aggravating circumstances at the penalty phase.[51]
The Louisiana statute established five grades of homicide, and death was a possible punishment only for first-degree murder, which comprised five categories.[52] The Court concluded that the statute "narrowly defined the categories of murders for which a death sentence could be imposed."[53] Thus,
the "narrowing function" was performed by the jury at the guilt phase when it found defendant guilty of three counts of murder under the provision that "the offender has a specific intent to kill or to inflict great bodily harm upon more than one person." The fact that the sentencing jury is also required to find the existence of an aggravating circumstance in addition is no part of the constitutionally required narrowing process....[54]
In Lowenfield, the five categories of first-degree murder that satisfied the narrowing function at the guilt phase also included a type of felony murder: killing a human being "[w]hen the offender has specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of aggravated kidnapping, aggravated escape, aggravated arson, aggravated rape, aggravated burglary, armed robbery, or simple robbery."[55] However, a killing involving the same enumerated felonies was only second-degree murder when the offender "has no intent to kill or to inflict great bodily harm."[56]
In light of Lowenfield, two questions are relevant here. First, is Nevada's definition of capital felony murder narrow enough that no further narrowing of death eligibility is needed once the defendant is convicted? Second, if not, does the felony aggravator sufficiently narrow death eligibility to reasonably *622 justify the imposition of a death sentence on the defendant? As we explain, the answer to the first question is no. As for the second, although the felony aggravator is somewhat narrower than felony murder generally, we conclude that the aggravator does not provide sufficient narrowing to satisfy constitutional requirements.
Nevada's statute defines felony murder broadly. Under NRS 200.030(1)(b), felony murder is one "[c]ommitted in the perpetration or attempted perpetration of sexual assault, kidnapping, arson, robbery, burglary, invasion of the home, sexual abuse of a child, sexual molestation of a child under the age of 14 years or child abuse." In Nevada, all felony murder is first-degree murder,[57] and all first-degree murder is potentially capital murder. This is much broader, for example, than Louisiana's capital felony-murder statute in Lowenfield.[58] Nevada's statute enumerates two more predicate felonies and some of the predicate felonies are multiple, e.g., either degree of kidnapping in Nevada but only "aggravated kidnapping" in Louisiana. More important though, capital felony murder in Louisiana requires specific intent to kill or to inflict great bodily harm, whereas felony murder in Nevada requires no such intent. In Nevada, the intent simply to commit the underlying felony is "transferred to supply the malice necessary to characterize the death a murder."[59]
Indeed, Nevada's current definition of felony murder is broader than the definition in 1972 when Furman v. Georgia[60] temporarily ended executions in the United States. NRS 200.030(1) then provided in pertinent part that murder "committed in the perpetration, or attempt to perpetrate, any arson, rape, robbery or burglary, ... shall be deemed murder of the first degree."[61] To these four predicate felonies formerly enumerated, NRS 200.030(1)(b) now adds kidnapping and four other felonies. So it is clear that Nevada's definition of felony murder does not afford constitutional narrowing. As Professor Richard Rosen points out: "At a bare minimum, then, a narrowing device must identify a more restrictive and more culpable class of first degree murder defendants than the pre-Furman capital homicide class."[62]
Because Nevada defines capital felony murder broadly, its capital sentencing scheme must narrow death eligibility in the penalty phase by the jury's finding of aggravating circumstances. We must decide whether the felony aggravator set forth in NRS 200.033(4) adequately performs this narrowing function for felony murder.
NRS 200.033(4) provides that first-degree murder is aggravated if it was committed while the defendant was engaged in
the commission of, or an attempt to commit or flight after committing or attempting to commit, any robbery, arson in the first degree, burglary, invasion of the home or kidnapping in the first degree, and the person charged:
(a) Killed or attempted to kill the person murdered; or
(b) Knew or had reason to know that life would be taken or lethal force used.
As stated above, first-degree felony murder is based on "the perpetration or attempted perpetration of sexual assault, kidnapping, arson, robbery, burglary, invasion of the home, sexual abuse of a child, sexual molestation *623 of a child under the age of 14 years or child abuse."[63]
The felony aggravator set forth in NRS 200.033(4) is somewhat narrower than felony murder in two ways. First, the felony aggravator statute enumerates five felonies, while felony murder can be based on nine felonies. And the aggravator applies only to kidnapping and arson in the first degree, while felony murder can be based on either degree of kidnapping or arson. However, although the felony aggravator does not apply to sexual assault or sexual abuse of a child[64] (both bases for felony murder), another aggravator under NRS 200.033(13) largely covers these offenses in the form of "nonconsensual sexual penetration." As discussed below, the problem of inadequate narrowing applies to this sexual-penetration aggravator with even more force than to the felony aggravator. The rest of our discussion will therefore refer to both the felony aggravator, NRS 200.033(4), and the sexual-penetration aggravator, NRS 200.033(13). Second, the felony aggravator applies only to cases where the defendant "[k]illed or attempted to kill" the victim or "[k]new or had reason to know that life would be taken or lethal force used." This adds an element not strictly required for felony murder. The sexual-penetration aggravator, however, does not add this element.
The question is, in a case of felony murder does either of these two aggravators "genuinely narrow the class of persons eligible for the death penalty and ... reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder"?[65] We conclude that the narrowing capacity of the aggravators is largely theoretical.
First, though the felony aggravator and the sexual-penetration aggravator reach four fewer felonies than does felony murder, the seven felonies reached (sexual assault, sexual abuse of a child, first-degree arson, burglary, invasion of the home, first-degree kidnapping, and particularly robbery) are much more likely to involve death than are the felonies not covered (sexual molestation of a child under the age of 14 years, child abuse, second-degree arson, and second-degree kidnapping).[66] So, in practical terms, these two aggravators still cover the vast majority of felony murders.
Next, though the felony aggravator, unlike felony murder, requires that the defendant "[k]illed or attempted to kill" the victim or "[k]new or had reason to know that life would be taken or lethal force used," this required element does little more than state the minimum constitutional requirement to impose death for felony murder. The emphasized language of the aggravator is actually slightly broader than that in Enmund v. Florida, where the Supreme Court concluded that the Eighth Amendment does not permit imposition of the death penalty on a defendant "who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed."[67] But the Court itself later broadened the standard slightly, holding that "major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the Enmund culpability requirement."[68] Still, this element of the felony aggravator largely mirrors the constitutional standard and does little to narrow the class *624 of death-eligible defendants.[69] By comparison, the definition of capital felony murder in Lowenfield which accomplished the necessary constitutional narrowing required "specific intent to kill or to inflict great bodily harm."[70]
Another problem is that this added element can be overlooked and may not even receive consideration by the jury. This case is an example. The jury was instructed:
The following are circumstances applicable in this case by which murder of the first degree may be aggravated:
1. The murder of Brian Lee Pierce was committed by Robert Lee McConnell while engaged in the commission of a robbery.
2. The murder of Brian Lee Pierce was committed by Robert Lee McConnell while engaged in the commission of a burglary.
3. The murder of Brian Lee Pierce involved mutilation of the victim.
(Instruction no. 8.) The jury was not informed that any further element needed to be found in regard to the two felony aggravators. But this omission had no prejudicial effect in this case since there is no dispute that McConnell intentionally killed Pierce; nor has McConnell raised this issue.
We conclude that although the felony aggravator of NRS 200.033(4) can theoretically eliminate death eligibility in a few cases of felony murder, the practical effect is so slight that the felony aggravator fails to genuinely narrow the death eligibility of felony murderers and reasonably justify imposing death on all defendants to whom it applies. This conclusion applies even more forcefully to the sexual-penetration aggravator of NRS 200.033(13). We therefore deem it impermissible under the United States and Nevada Constitutions to base an aggravating circumstance in a capital prosecution on the felony upon which a felony murder is predicated.
This decision has no effect in a case where the State relies solely on a theory of deliberate, premeditated murder to gain a conviction of first-degree murder; it can then use appropriate felonies associated with the murder as aggravators. But in cases where the State bases a first-degree murder conviction in whole or part on felony murder, to seek a death sentence the State will have to prove an aggravator other than one based on the felony murder's predicate felony. (Even absent this consideration, judicious charging of felony murder should be the rule in any case.[71]) We advise the State, therefore, that if it charges alternative theories of first-degree murder intending to seek a death sentence, jurors in the guilt phase should receive a special verdict form that allows them to indicate whether they find first-degree murder based on deliberation and premeditation, felony murder, or both. Without the return of such a form showing that the jury did not rely on felony murder to find first-degree murder, the State cannot use aggravators based on felonies which could support the felony murder.
We further prohibit the State from selecting among multiple felonies that occur during "an indivisible course of conduct having one principal criminal purpose"[72] and *625 using one to establish felony murder and another to support an aggravating circumstance. For example, in a case like this one, the burglary could not be used to establish first-degree felony murder while the associated robbery was used as an aggravator to support a death sentence. The burglary and robbery both occurred in an indivisible course of conduct whose primary purpose was the murder of Pierce.
This does not mean that it was improper for the State to allege two aggravators based on robbery and burglary rather than one, as McConnell argues without citing any supporting authority. We have repeatedly held that robbery and burglary occurring in a single course of conduct can be charged as separate aggravators.[73] We do not alter this precedent, though we reject extending it to permit the State to base a felony murder on one felony and then base an aggravator on an associated felony. Whether burglary and robbery are described as two aggravators or one should not unduly influence jurors, who should be clearly instructed that "the weighing of aggravating and mitigating circumstances is not a simplistic, mathematical process" and in no way depends on the sheer number of either.[74]
McConnell also contends that Nevada's death penalty statutes fail to constitutionally narrow death eligibility because the statutory aggravating circumstances in NRS 200.033 are so numerous and because NRS 175.552(3) permits unlimited aggravating evidence beyond the statutory aggravating circumstances. We hold to our precedent rejecting similar general challenges to Nevada's capital sentencing scheme.[75]

The sufficiency of the evidence of mutilation
McConnell also argues that the evidence was insufficient to support the aggravating circumstance of mutilation under NRS 200.033(8). Consistent with this court's caselaw,[76] the jury was instructed:
"Mutilate" means to cut off or permanently destroy a limb or essential part of the body or to cut off or alter radically so as to make imperfect.
In order for mutilation to be found as an aggravating circumstance, there must be mutilation of the victim beyond the act of killing.
(Instruction no. 12.) This court has also explained that the intent of NRS 200.033(8) is to discourage desecration of the body of a fellow human being.[77]
The prosecutor argued to the jury that mutilation resulted when McConnell dug into Pierce's body with a knife and then plunged the knife into it. The record shows that these actions went beyond the act of killing and caused serious abuse that altered radically Pierce's torso or abdomen, which is an essential part of the body. Desecration is also apparent in McConnell's callous, disrespectful treatment of the body. We conclude that the evidence was sufficient to support the jury's finding of the aggravating circumstance.

The sufficiency of the notice of the State's case in aggravation
Next, McConnell complains that the State argued facts in support of an aggravating circumstance without giving him required notice. The State filed a Notice of Intent to Seek Death Penalty which alleged among other things that the murder was committed during the course of a burglary. The State alleged that the burglary occurred when McConnell entered the victim's home with the intent to kill. In closing argument, however, *626 the prosecutor argued that the burglary occurred based not only on McConnell's intent to kill but also his intent to rob and to commit sexual assault. McConnell says that this violated SCR 250 and deprived him of his right to due process as well as other constitutional rights.
SCR 250(4)(c) requires the State, within 30 days after filing an information or indictment, to file a notice of intent to seek the death penalty: "The notice must allege all aggravating circumstances which the state intends to prove and allege with specificity the facts on which the state will rely to prove each aggravating circumstance." And SCR 250(4)(f) requires the State to file, no later than 15 days before trial, a notice of evidence in aggravation "summariz[ing] the evidence which the state intends to introduce at the penalty phase of trial... and identify[ing] the witnesses, documents, or other means by which the evidence will be introduced." The State filed notice under this latter provision of the rule as well.
McConnell did not object to the State's argument and is therefore required to demonstrate that it constituted a plain error affecting his substantial rights.[78] Although the State may have technically violated SCR 250(4)(c) by arguing theories of intent for the burglary that went beyond the one set forth in the notice of intent to seek death, McConnell has not shown that any error was plain. More important, he has not shown the slightest prejudice, let alone an effect on his substantial rights. The evidence for the burglary was overwhelming, and McConnell does not argue that one did not occur. Nor does he argue that the State introduced or relied on any facts at the penalty phase for which he had no notice.

The propriety of various jury instructions
McConnell claims that the district court failed to instruct the jury properly on three issues. He did not object to any of the instructions or propose any different instructions, so he is again required to demonstrate plain error affecting his substantial rights.[79]
He first complains that the district court gave the jury no guidance to distinguish evidence relevant to aggravating circumstances from the other evidence presented against him. He does not specify what form this guidance should have taken. The jury was correctly instructed under our caselaw[80] regarding the proper use of evidence presented at a capital penalty hearing. (Instruction no. 20.) McConnell fails to show that any error occurred here.
Second, he claims that the district court failed to instruct the jury that life in prison without parole means exactly that and that his sentence could not be commuted if he received life without parole. This claim is baseless. The jury was instructed: "Life imprisonment without the possibility of parole means exactly what it says, that the Defendant shall not be eligible for parole." (Instruction no. 19.)
Finally, McConnell claims that the district court failed to instruct the jury that because of the deadly weapon enhancement he would not be eligible for parole for at least 40 years if given a sentence allowing parole. Since the jury returned a verdict of death and not life in prison without parole, we do not see how McConnell could have been prejudiced. Regardless, the jurors were adequately informed. Instruction no. 19 informed them that a sentence allowing parole "does not mean that the Defendant would be paroled after 20 years but only that the Defendant would be eligible for parole after that period of time," and the verdict forms further informed them that either sentence allowing parole would include a second equal and consecutive prison term for the use of a firearm.

Mandatory statutory review of the death penalty
NRS 177.055(2) requires this court to review every death sentence and consider:

*627 (c) Whether the evidence supports the finding of an aggravating circumstance or circumstances;
(d) Whether the sentence of death was imposed under the influence of passion, prejudice or any arbitrary factor; and
(e) Whether the sentence of death is excessive, considering both the crime and the defendant.
In regard to the first question, the evidence supported the three aggravating circumstances. McConnell does not dispute the sufficiency of the evidence for the two felony aggravators, and the evidence of mutilation, as discussed above, was sufficient.
McConnell asserts that his death sentence is excessive and resulted from passion and prejudice because he had no significant prior criminal history and the jury was improperly exposed to inflammatory evidence. He specifically cites as improper the evidence that he said he wanted to cut Pierce's head off after the murder, that he phoned Pierce's family saying that their son died like a coward, and that he drew offensive images and wrote offensive comments on Pierce's image. As discussed above, this evidence was admissible, and the jury was properly instructed on its use. We discern no indication that the death sentence was imposed under the influence of passion, prejudice, or any arbitrary factor.
McConnell committed this murder with a shocking degree of deliberation and premeditation and without any comprehensible provocation. He presented no compelling mitigating evidence. We conclude that considering McConnell and his crime, the sentence of death is not excessive.

CONCLUSION
We affirm the judgment of conviction and sentence of death. We also hold that a felony may not be used both to establish first-degree murder and to aggravate the murder to capital status. The interpretation of our death penalty statutes that we now embrace will provide a more certain framework within which prosecutors statewide may exercise their very important discretion in these matters, and will provide greater certainty and fairness of application within the trial, appellate, and federal court systems.
BECKER, J., concurring in result only.
I agree with the decision of the court to affirm McConnell's conviction. I also agree that the court needs to consider the validity of Nevada's death penalty scheme in light of Lowenfield v. Phelps,[1] the changes in Nevada's statutes that have occurred since our decision in Petrocelli v. State,[2] and recent reconsideration of death penalty case law by the United States Supreme Court.[3] However, in light of the sixteen-year period that has passed since Lowenfield, I would still have set this matter for oral argument, despite the State's failure to address Lowenfield, and I also believe the court should have requested amicus briefing. For these reasons I concur only in the result.
NOTES
[1] The Honorable Deborah A. Agosti, Justice, voluntarily recused herself from participation in the decision of this appeal.
[2] Pursuant to NRAP 34(f)(1) and SCR 250(6)(f), we have determined that oral argument is not warranted in this appeal.
[3] There was considerable discussion outside the presence of the jury as to whether the temporary protective order (TPO) would be admitted into evidence. Robinson mentioned the TPO during her direct examination. McConnell wanted to cross-examine her on the TPO, to show that she had violated its terms. The State objected, arguing that the TPO was irrelevant and potentially confusing. The district court agreed with the State and ruled that the TPO did not mitigate McConnell's actions and was not a proper subject of cross-examination.
[4] See 1983 Nev. Stat., ch. 601, § 1, at 1937.
[5] See also NRS 453.377(6) (providing that otherwise controlled substances may be legally released by a pharmacy to the Director of the Department of Corrections for use in an execution); NRS 454.221(2)(f).
[6] Castillo v. State, 110 Nev. 535, 546, 874 P.2d 1252, 1259 (1994) (quoting Sheriff v. Martin, 99 Nev. 336, 340, 662 P.2d 634, 637 (1983)), disapproved on other grounds by Wood v. State, 111 Nev. 428, 430, 892 P.2d 944, 946 (1995).
[7] See Deborah W. Denno, When Legislatures Delegate Death: The Troubling Paradox Behind State Uses of Electrocution and Lethal Injection and What It Says About Us, 63 Ohio St. L.J. 63, 141, 185, 228 (2002).
[8] See Leonard v. State, 117 Nev. 53, 63, 17 P.3d 397, 403 (2001) ("Generally, failure to object will preclude appellate review of an issue.").
[9] See NRS 177.025 ("The appeal to the Supreme Court from the district court can be taken on questions of law alone.").
[10] 46 Nev. 418, 211 P. 676 (1923).
[11] The statute was the predecessor to Nevada's current lethal injection statute, NRS 176.355, and contained similar language. See 1921 Nev. Stat., ch. 246, § 431, at 387.
[12] Jon, 46 Nev. at 435, 211 P. at 681.
[13] Id. at 436, 211 P. at 681.
[14] Id. at 436-38, 211 P. at 681-82.
[15] McKenna v. State, 114 Nev. 1044, 1051, 968 P.2d 739, 744 (1998).
[16] Hollaway v. State, 116 Nev. 732, 746, 6 P.3d 987, 997 (2000); McKenna, 114 Nev. at 1051-52, 968 P.2d at 744; NRS 48.035(1).
[17] See Hollaway, 116 Nev. at 746, 6 P.3d at 996-97; Byford v. State, 116 Nev. 215, 238-39, 994 P.2d 700, 715-16 (2000); NRS 175.552(3).
[18] See NRS 178.602 ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."); Gallego v. State, 117 Nev. 348, 365, 23 P.3d 227, 239 (2001).
[19] 117 Nev. 609, 635-36, 28 P.3d 498, 516-17 (2001).
[20] Thomas v. State, 120 Nev. 37, 47, 83 P.3d 818, 825 (2004).
[21] Hernandez v. State, 118 Nev. 513, 525, 50 P.3d 1100, 1108 (2002) (quoting United States v. Young, 470 U.S. 1, 11, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985)).
[22] See Jones v. State, 113 Nev. 454, 468, 937 P.2d 55, 64 (1997).
[23] See NRS 178.602; Gallego, 117 Nev. at 365, 23 P.3d at 239.
[24] 113 Nev. 579, 584-85, 939 P.2d 1029, 1032-33 (1997); U.S. Const. amend. V.
[25] 113 Nev. at 584-85, 939 P.2d at 1032-33. McConnell also cites Mitchell v. United States, 526 U.S. 314, 119 S.Ct. 1307, 143 L.Ed.2d 424 (1999), but it is no more apposite to his case than is Brake. Moreover, the Court in Mitchell "express[ed] no view" on "[w]hether silence bears upon the determination of a lack of remorse." 526 U.S. at 330, 119 S.Ct. 1307.
[26] This was apparently a quote from dialog in the movie The Untouchables.
[27] See NRS 178.602; Gallego, 117 Nev. at 365, 23 P.3d at 239.
[28] Id.
[29] Robinson apparently had a criminal conviction, and McConnell filed a subpoena duces tecum to obtain her presentence report. The district court granted the State's motion to quash the subpoena. McConnell maintains this was unfair but does not raise it as a distinct issue. He suggests that Robinson may have accused him of violent behavior to help herself in her own case, but his own testimony did not contradict Robinson's basic description of the crimes.
[30] Quillen v. State, 112 Nev. 1369, 1382, 929 P.2d 893, 901 (1996) (quoting Williams v. State, 103 Nev. 106, 109, 734 P.2d 700, 702 (1987)).
[31] See NRS 178.602; Gallego, 117 Nev. at 365, 23 P.3d at 239.
[32] 118 Nev. 787, 806, 59 P.3d 450, 462 (2002).
[33] 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002); see also Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).
[34] 118 Nev. at 799-804, 59 P.3d at 458-61.
[35] See Collman v. State, 116 Nev. 687, 722, 7 P.3d 426, 448 (2000).
[36] The State's failure to address this issue contributed to our decision not to conduct oral argument in this case. We also note that this is a recurring issue that has long confronted this court, as the following discussion demonstrates.
[37] 101 Nev. 46, 692 P.2d 503 (1985), holding modified on other grounds by Sonner v. State, 114 Nev. 321, 327, 955 P.2d 673, 677 (1998).
[38] Id. at 53, 692 P.2d at 509 (emphasis added) (citing Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (plurality opinion)).
[39] See, e.g., Atkins v. State, 112 Nev. 1122, 1134, 923 P.2d 1119, 1127 (1996).
[40] 484 U.S. 231, 241-46, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988).
[41] See Leslie v. Warden, 118 Nev. 773, 784-86, 59 P.3d 440, 448-49 (2002) (Maupin, J., concurring) (discussing Lowenfield and this issue).
[42] A number of other courts have considered this issue since Lowenfield was decided. Opinions determining that use of the felony in a felony murder as an aggravator was proper include: Deputy v. Taylor, 19 F.3d 1485, 1500-02 (3d Cir.1994); Perry v. Lockhart, 871 F.2d 1384, 1392-93 (8th Cir.1989); and Ferguson v. State, 642 A.2d 772, 780-81 (Del.1994). Opinions determining that such use was not proper include: State v. Middlebrooks, 840 S.W.2d 317, 341-47 (Tenn.1992), superseded by statute as stated in State v. Stout, 46 S.W.3d 689, 705-06 (Tenn.2001); and Engberg v. Meyer, 820 P.2d 70, 86-92 (Wyo.1991).
[43] U.S. Const. amend. VIII.
[44] Gregg, 428 U.S. at 200, 206-07, 96 S.Ct. 2909 (plurality opinion) (summarizing Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972)); id. at 220-21, 96 S.Ct. 2909 (White, J., concurring) (same). The Eighth Amendment applies to the states through the Fourteenth Amendment's Due Process Clause. Robinson v. California, 370 U.S. 660, 666, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962); U.S. Const. amend. XIV, § 1.
[45] Zant v. Stephens, 462 U.S. 862, 877, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983).
[46] Nev. Const. art. 1, §§ 6, 8(5).
[47] 484 U.S. at 244, 108 S.Ct. 546.
[48] Id. at 241, 108 S.Ct. 546.
[49] Id. at 243, 108 S.Ct. 546 (quoting La.Rev.Stat. Ann. § 14:30(A)(3) (West 1986); La.Code Crim. Proc. Ann., Art. 905.4(d) (West 1984)).
[50] Id. at 241-46, 108 S.Ct. 546.
[51] Id. at 246, 108 S.Ct. 546.
[52] Id. at 241-42, 108 S.Ct. 546.
[53] Id. at 245, 108 S.Ct. 546.
[54] Id. at 246, 108 S.Ct. 546.
[55] Id. at 242, 108 S.Ct. 546 (quoting La.Rev.Stat. Ann. § 14:30(A)(1)) (emphasis added).
[56] Id. at 241 n. 5, 108 S.Ct. 546 (quoting La.Rev.Stat. Ann. § 14:30.1(2)).
[57] We will not delve into a court-made exception to this statement. More than 20 years ago, this court recognized a "second-degree felony murder" involving homicides committed without specific intent to kill in the course of a limited number of life-endangering felonies not included within NRS 200.030(1)(b). See Sheriff v. Morris, 99 Nev. 109, 113-18, 659 P.2d 852, 856-59 (1983).
[58] Our discussion of Louisiana statutes refers only to the statutory scheme addressed by the Supreme Court in Lowenfield. We have not considered any possible changes to that scheme since Lowenfield.
[59] Ford v. State, 99 Nev. 209, 215, 660 P.2d 992, 995 (1983).
[60] 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346.
[61] 1967 Nev. Stat., ch. 523, § 438, at 1470. NRS 200.030(3) provided that death was a potential penalty for all first-degree murder. Id.
[62] Richard A. Rosen, Felony Murder and the Eighth Amendment Jurisprudence of Death, 31 B.C.L.Rev. 1103, 1124 (1990).
[63] NRS 200.030(1)(b).
[64] See NRS 432B.100 (defining "sexual abuse"); NRS 200.030(6)(d).
[65] Zant, 462 U.S. at 877, 103 S.Ct. 2733.
[66] See NRS 200.030(6)(b), (e) (defining "child abuse" and "sexual molestation").
[67] 458 U.S. 782, 797, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982) (emphasis added). Although not the intent of the felony-aggravator statute (or Enmund), if the defendant killed the victim during a felony, the plain language of the statute requires no jury finding of intent or knowledge on the part of the defendant in order to impose death. But it is still possible that such a killing could be accidental. Jurors should be instructed that even if the defendant killed the victim, they must still find that the defendant intended to kill or at least knew or should have known that a killing would take place or lethal force would be applied.
[68] Tison v. Arizona, 481 U.S. 137, 158, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987).
[69] Cf. Middlebrooks, 840 S.W.2d at 345 ("[S]ince the absence of reckless indifference constitutionally immunizes a defendant from the death penalty, its presence cannot meaningfully further narrow the class of death-eligible defendants."); Rosen, supra note 62, at 1130 (same). But see Perry, 871 F.2d at 1393 & n. 5 (concluding that an Arkansas statute, which in relevant part defines capital murder as causing death in the course of an enumerated felony "under circumstances manifesting extreme indifference to the value of human life," constitutionally narrows death eligibility (quoting Ark. Stat. Ann. § 41-1501(1))).
[70] 484 U.S. at 242, 108 S.Ct. 546 (quoting La.Rev.Stat. Ann. § 14:30(A)(1)) (emphasis added).
[71] As we have stated before, the felony-murder doctrine is widely criticized: "the weight of authority calls for restricting" the doctrine, and "the trend has been to limit its applicability." Collman, 116 Nev. at 717, 7 P.3d at 445 (citing Model Penal Code and Commentaries § 210.2 cmt. 6 at 29-42 (Official Draft and Revised Comments 1980); Wayne R. LaFave & Austin W. Scott, Jr., Criminal Law § 7.5, at 622-23, 632, 640-41 (2d ed.1986)).
[72] People v. Harris, 36 Cal.3d 36, 201 Cal.Rptr. 782, 679 P.2d 433, 449 (1984), rejected by People v. Proctor, 4 Cal.4th 499, 15 Cal.Rptr.2d 340, 842 P.2d 1100, 1129-30 (1992). In 1992, we declined to follow Harris, which prohibited the use of multiple felonies occurring during "an indivisible course of conduct" to support separate aggravating circumstances. Homick v. State, 108 Nev. 127, 137-38, 825 P.2d 600, 607 (1992). Our precedent in this regard does not change, as the continuing discussion indicates.
[73] See, e.g., Homick, 108 Nev. at 137-38, 825 P.2d at 607.
[74] See State v. Haberstroh, 119 Nev. 173, 184, 69 P.3d 676, 683 (2003).
[75] See, e.g., Rhyne v. State, 118 Nev. 1, 14, 38 P.3d 163, 171-72 (2002); Servin v. State, 117 Nev. 775, 785-86, 32 P.3d 1277, 1285 (2001); Middleton v. State, 114 Nev. 1089, 1116-17, 968 P.2d 296, 314-15 (1998).
[76] See Vanisi v. State, 117 Nev. 330, 342, 22 P.3d 1164, 1172 (2001).
[77] Byford, 116 Nev. at 241, 994 P.2d at 717.
[78] See NRS 178.602; Gallego, 117 Nev. at 365, 23 P.3d at 239.
[79] Id.
[80] Evans, 117 Nev. at 635-36, 28 P.3d at 516-17.
[1] 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988).
[2] 101 Nev. 46, 692 P.2d 503 (1985), holding modified on other grounds by Sonner v. State, 114 Nev. 321, 327, 955 P.2d 673, 677 (1998).
[3] See Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).